# **EXHIBIT 1**

Page 1

```
         UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF INDIANA
              INDIANAPOLIS DIVISION
      CIVIL ACTION NO. 1:22-cv-01246-SEB-MJD

THE ESTATE OF HERMAN WHITFIELD,  )
III,                             )
                                 )
         Plaintiff,              )
                                 )
            -vs-                 )
                                 )
THE CITY OF INDIANAPOLIS,        )
STEVEN SANCHEZ, ADAM AHMAD,      )
MATTHEW VIRT, DOMINIQUE CLARK,   )
JORDAN BULL, and NICHOLAS        )
MATTHEW,                         )
                                 )
         Defendants.             )
```

VIDEO-RECORDED DEPOSITION OF KENDALE ADAMS

    The deposition upon oral examination of
KENDALE ADAMS, a witness produced and sworn before
me, Janine A. Ferren, RMR, CRR, CSR-IL No. 84-4852,
Notary Public in and for the County of Hamilton,
State of Indiana, taken on behalf of the Plaintiff,
at the offices of Veritext, 111 Monument Circle,
Suite 4350, Indianapolis, Marion County, Indiana,
on the 17th day of March, 2023, scheduled to
commence at 12:30 p.m., pursuant to the Federal
Rules of Civil Procedure with written notice as to
time and place thereof.

Page 4

1    (Time noted:  12:46 p.m.)
2                    KENDALE ADAMS,
3    having been duly sworn to tell the truth, the whole
4    truth, and nothing but the truth relating to said
5    matter, was examined and testified as follows:
6
7         MR. WAPLES:  This is Richard Waples,
8       attorney for the plaintiff.  I'd note that the
9       deposition here is by notice and it's in person
10      and recorded by Zoom.
11   DIRECT EXAMINATION,
12      QUESTIONS BY RICHARD A. WAPLES:
13   Q   Could you please state your name?
14   A   Kendale Adams.
15   Q   What do you do, Mr. Adams?
16   A   I'm the deputy chief of the criminal
17      investigations division for Indianapolis
18      Metropolitan Police Department.
19   Q   How long have you been so employed?
20   A   25 years.
21   Q   With IMPD?
22   A   Yes, sir.
23   Q   And you've been called as a witness here today
24      in the case of the estate of Herman Whitfield
25      III against the City of Indianapolis.  You

Page 8

1      performance as deputy chief?
2  A   Yes.
3  Q   And then 2021 onward?
4  A   2021, yeah, until today.
5  Q   Until today, still --
6  A   Yeah, I'm over --
7  Q   -- you're a deputy chief of criminal
8      investigations?
9  A   Correct.
10 Q   Where does that fit in the hierarchy with chief,
11     and then?
12 A   Yeah.  So you have the chief, you have assistant
13     chiefs, and then -- a assistant chief, and then
14     you have four deputy chiefs.  Each deputy chief
15     has a different division.  And then from that
16     division, you have, you know, like your officers
17     in a police car, that's called the deputy chief
18     of operations.  He has about 800 men and women
19     under him.
20          Criminal investigations division has about
21     350 investigators under me.
22          And then under our admin, that's budget,
23     you know, that's, you know, how we procure
24     things, contracts.
25          And then you have now training, policy, and

```
 1        planning, so that falls under Deputy Chief
 2        Cummings.
 3   Q    Catherine Cummings, and she's the head of that
 4        training and --
 5   A    Yes.  It's training, policy, and planning.
 6   Q    And so as the deputy chief of criminal
 7        investigations from 2021 on, you're kind of the
 8        hands-on guy as far as the chief -- deputy chief
 9        in charge of all of that division?
10   A    Yes, sir, that is correct.
11   Q    So all of those folks that do criminal
12        investigations, roughly 350, you said they
13        report up to you?
14   A    Yes, sir, that's correct.
15   Q    Can you tell me what you've done to prepare for
16        the deposition?
17   A    Yes, sir, I've looked at --
18             MR. OVERHOLT:  I'm going to object.  He met
19        with me.  I'm not going to have him talk about
20        what we reviewed or what we discussed.
21             Other than that, you can testify.
22   A    Yes, sir, just looked at a few notes I had from
23        that evening, looked at body cam, looked at the
24        critical incident video.  That's pretty much
25        what I've looked at thus far.
```

Page 12

1  A   Yes.  That was my -- other than the detectives,
2      obviously I talked to the detectives just to
3      check in with them to see if they need anything,
4      where we were kind of at in terms of the
5      investigation.  But then my attention turned to
6      attorney Cruz and just making sure the family
7      also had what they needed, because they were
8      still there on the scene when I got there.
9  Q   And the scene was their home?
10 A   Correct.
11 Q   Who were the principal investigators of this
12     in-custody death of Herman Whitfield III?
13 A   Typically, when we have an in-custody death or
14     an officer-involved shooting, we have a Critical
15     Incident Response Team that's led by group of
16     typically seasoned detectives and a supervisor.
17     And this particular investigation was going to
18     be headed up by Sergeant Mike Duke.  He's a
19     sergeant in homicide.
20 Q   And then did he have people working with him on
21     it?
22 A   Yes.  So the Critical Incident Response Team is
23     a team of investigators that work to mitigate
24     that scene, investigate that scene, work with
25     crime lab, work with the prosecutor's office,

Page 13

1      make sure that we have everything that we have.
2      So there is a group of them, but I'm not clear
3      on who beyond Sergeant Duke was on the team.  I
4      know I talked to the lieutenant, Eli McAllister
5      was there that morning when I arrived.
6    Q  And it would have been Sergeant Duke, he would
7      have been in charge of that Critical Incident
8      Response Team?
9    A  Yes, sir, that is correct.
10   Q  And his job would have been to interview
11     witnesses, him or people working with him,
12     interview witnesses, collect evidence?
13   A  Not collect evidence, but work with crime lab in
14     terms of what evidence would be collected.  So
15     in this particular -- because it's a CIRT
16     call-out, crime lab would do the collection of
17     the evidence.
18   Q  CIRT call, can you explain what that is?
19   A  Yeah, critical incident response.  So anytime an
20     officer uses force and someone is SBI, or
21     serious bodily injury, or dies, we have what's
22     called a Critical Incident Response Team, and
23     that team responds to investigate.
24   Q  So that's what CIRT means?
25   A  Yes, sir.

Page 22

```
 1        the officers that would have agreed to talk to
 2        them, not talk to the other ones; correct?
 3   A    That's correct, sir.
 4   Q    All right.  And then they would have talked to
 5        any other witnesses that were potentially
 6        available, I take it?
 7   A    Yes, sir, that's correct.
 8   Q    As a general matter.  And they would have
 9        gathered or reviewed with crime lab any physical
10        evidence that was available --
11   A    Yes, sir.
12   Q    -- and taken that in consideration?
13   A    Yes, sir.
14   Q    And then did any follow-up investigation on
15        either that hard evidence or any of the
16        information they got from witness statements, I
17        take it?
18   A    Yes, sir.
19   Q    And that would be the extent of their
20        investigation, I take it?
21   A    Yes, sir.  I mean, obviously they work in
22        collaboration with the prosecutor's office to do
23        any follow-up that may be required.
24   Q    If the prosecutor instructs them to do so, I
25        take it?
```

Page 23

1  A   Correct.
2  Q   And the prosecutor, do they take the result --
3      do the investigators take -- like Sergeant Duke
4      take the results of his investigation and give
5      it to the prosecutor's office?
6  A   Typically, in these kind of investigations, just
7      like any investigation, we type up a PC and then
8      give that -- submit that to the screening
9      prosecutor for their review.
10 Q   Do you know if that was done in this case?
11         MR. OVERHOLT:  I'm going to object;
12     instruct him not to answer.
13 Q   Is the Marion County Prosecutor's Office a
14     separate entity than the City of Indianapolis
15     Metropolitan Police Department?
16 A   Yes, sir.  So there are multiple entities
17     involved in this investigation, from the
18     coroners to the prosecutors and to crime lab and
19     us.  So on these investigations, these are four
20     separate agencies that are working collaborative
21     around this case, but they are independent of
22     Indianapolis Metropolitan Police Department.
23 Q   Were you concerned that any policies of the City
24     of Indianapolis Metropolitan Police Department
25     were not followed in this case?

Page 24

1           MR. OVERHOLT:  I'm going to object and
2      instruct the witness not to answer.
3           MR. WAPLES:  On what grounds?
4           MR. OVERHOLT:  That is covered by
5      deliberative process privilege which has also
6      been asserted as part of the discovery in this
7      case, given that the internal affairs
8      investigation and administrative review is still
9      ongoing.
10          MR. WAPLES:  Well, let's -- I understand
11     you're instructing him not to answer.  I'll ask
12     additional questions around that or about that.
13  BY MR. WAPLES:
14  Q   Is Sergeant Duke's investigation of any
15      potential criminal charges still ongoing?
16          MR. OVERHOLT:  I think I'll let you answer.
17      Yeah, you can answer that.
18  A   Is the investigating still ongoing?
19  Q   Yes.
20  A   Yes, I mean --
21  Q   In what way?
22  A   Until we have a decision by the prosecutor's
23      office, we consider that still an active and
24      open investigation.  You know, he could -- not
25      he, but screening prosecutors could come back

Page 33

| | | |
|---|---|---|
| 1 | | administrative. |
| 2 | Q | And I understand -- and criminal investigation |
| 3 | | would have been to look at potential criminal |
| 4 | | charges; correct? |
| 5 | A | Yes. |
| 6 | Q | And the administrative investigation would be to |
| 7 | | look at -- |
| 8 | A | Policy. |
| 9 | Q | Policy violations? |
| 10 | A | Violations or policy adherence. |
| 11 | Q | And who headed up the administrative |
| 12 | | investigation? |
| 13 | A | That would be led by our internal affairs |
| 14 | | section. |
| 15 | Q | And would they -- and who headed up that, if you |
| 16 | | know? |
| 17 | A | Captain Roehrig. |
| 18 | Q | Can you spell Captain Roehrig's -- |
| 19 | A | I think it's R-O-E-H-I-N-G [sic], something like |
| 20 | | that. |
| 21 | Q | And what is Captain Roehrig's first name? |
| 22 | A | Jim. |
| 23 | Q | And he's with internal affairs? |
| 24 | A | Yes, sir, that is correct. |
| 25 | Q | And would they look at the same factual |

Page 34

```
 1         information in terms of what happened at the
 2         scene, the witnesses and the evidence?
 3   A     They are privy to everything that the criminal
 4         investigation has, plus the officers are -- give
 5         a compelled statement.
 6   Q     Do you know if the officers gave compelled
 7         statements in that?
 8   A     I don't.
 9   Q     If they had, those would have already occurred,
10         I take it?
11   A     Yes.
12   Q     And then they would look at all of that
13         information and determine whether there were any
14         policy violations of the department, or whether
15         they were adhered to?
16   A     Yes, yeah.  They don't -- they make a
17         determination on if there are policy violations,
18         and then that is submitted to the chief of
19         police.
20   Q     Has there been such a submission to the chief of
21         police?
22               MR. OVERHOLT:  I'm going to object and
23         instruct the witness not to answer based on the
24         deliberative process privilege.
25               MR. WAPLES:  I'm not asking what the
```

1   results of it was. I'm just asking factually
2   whether there has been some report that was done
3   by the internal affairs division, part of their
4   administrative investigation reporting to the
5   chief about the results of their administrative
6   investigation. Has that been completed or not?
7   And if so, when?
8       MR. OVERHOLT: And my response to that is,
9   I object and instruct the witness not to answer.
10      MR. WAPLES: Not even the date?
11      MR. OVERHOLT: Correct. We're not -- we're
12  not getting into -- we're not getting into the
13  status, outcomes, anything like that regarding
14  those two investigations, unless the court says
15  we have to, because it's premature.
16 Q Well, we know in terms of the criminal
17  investigation, at least by July 22nd of 2022,
18  that criminal investigation division submitted
19  their investigation to the prosecutor's office;
20  correct?
21 A Correct.
22 Q Which tells me that that was sufficient time for
23  them to do whatever investigation they thought
24  was necessary. I would assume that there would
25  be a similar timeline or nothing much greater or

Page 74

1      and manner"?
2  A   Yes, sir.
3  Q   And "Slowing down the situation"?
4  A   Yes, sir.
5  Q   And "Creating distance and using environmental
6      barriers appropriately"?
7  A   Yes, sir.
8  Q   As with the other policies, I was going to ask
9      you if the officers involved in Herman
10     Whitfield's case, did they appropriately follow
11     this policy or not?
12         MR. OVERHOLT: I'm going to object and
13     instruct him not to answer.
14         MR. WAPLES: And that's with respect to all
15     these policies, correct, Mr. Overholt, whether
16     the officers that day followed them or did not
17     follow them?
18         MR. OVERHOLT: That's correct. That would
19     be both -- well, as to the policies would be an
20     issue to the deliberative process privilege.
21         (Deposition Exhibit 8 marked for
22     identification.)
23 Q   I'm going to hand you Exhibit 8, which is
24     "Prisoner Handling, Transportation and Escape."
25     Is this the general order of the Indianapolis

Page 89

```
 1   STATE OF INDIANA            )
                                 )  SS:
 2   COUNTY OF HAMILTON          )
 3         I, Janine A. Ferren, a Notary Public in and
 4   for the County of Hamilton, State of Indiana at
 5   large, do hereby certify that KENDALE ADAMS, the
 6   deponent herein, was by me first duly sworn to tell
 7   the truth, the whole truth, and nothing but the
 8   truth in the aforementioned matter;
 9         That the foregoing deposition was taken on
10   behalf of the Plaintiff, at the offices of
11   Veritext, 111 Monument Circle, Suite 4350,
12   Indianapolis, Marion County, Indiana, on the
13   17th day of March, 2023, commencing at the hour of
14   12:46 p.m., pursuant to the Federal Rules of Civil
15   Procedure;
16         That said deposition was taken down
17   stenographically and transcribed under my
18   direction, and that the typewritten transcript is a
19   true record of the testimony given by the said
20   deponent; and thereafter presented to said deponent
21   for his signature;
22         That the parties were represented by their
23   counsel as aforementioned.
24         I do further certify that I am a disinterested
25   person in this cause of action; that I am not a
```

1  relative or attorney of any party, or otherwise
2  interested in the event of this action, and am not
3  in the employ of the attorneys for any party.
4     IN WITNESS WHEREOF, I have hereunto set my
5  hand and affixed my notarial seal on this 31st
6  day of March, 2023.
7
8
9
10                              Janine A. Ferren
11
12
   Seal, Notary Public        My Commission Expires:
13 State of Indiana            April 22, 2024
14 Janine A. Ferren            County of Residence:
   Commission No. NP0681591    Hamilton
15
16
17
18
19
20
21
22
23
24
25