# EXHIBIT 21

STATE OF INDIANA
COUNTY OF MARION
SUPERIOR COURT
CRIMINAL DIVISION
ROOM 29

STATE OF INDIANA,    . Cause No. 49D29-2304-F5-010443
    .
   Plaintiff,    .
    .
     v.    .
    .
STEVEN SANCHEZ,    .
    .
   Defendant.    .
. . . . . . . . . . . . .
STATE OF INDIANA,    . Cause No. 49D29-2304-F5-010447
    .
   Plaintiff,    .
    .
     v.    .
    .
ADAM AHMAD,    .
    .
   Defendant.    .

. . . . . . . . . . . . .

TAPED STATEMENT OF ALON STEINBERG, M.D.
JUNE 4, 2024
VIA ZOOM


COURT REPORTER:    Suzanna K. Cable
    INDY DEPOSITIONS LLC
    8780 Purdue Road
    Suite
    Indianapolis, IN  46268
    (317) 450-6218
    www.indydepositions.com
    Email: depositions@att.net


1

## Page 2

1  APPEARANCES OF COUNSEL:

2

FOR THE STATE OF INDIANA:

3  .

Daniel Cicchini and John Gallo

4  MARION COUNTY PROSECUTOR'S OFFICE

251 E. Ohio

5  Suite 160

Indianapolis, IN 46204

6

7

FOR THE DEFENDANTS, ADAM AHMAD AND STEVEN SANCHEZ:

8

John Kautzman and Mason Riley

9  RUCKELS HAUSKAUTZMAN BLACKWELL BEMIS & DUNCAN, LLP

135 N. Pennsylvania Street

10  Suite 1600

Indianapolis, IN  46204

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1  Whereupon:

2      MR. CICCHINI:  It is Tuesday, June 4, 2024.  We

3  are here for a deposition in the matter of State of

4  Indiana versus Adam Ahmad, 49D29-2304-F5-010447, and

5  State of Indiana versus Steven Sanchez, 49D29-2304-

6  F5-01044349.  Present for the State of Indiana, Dan

7  Cicchini and John Gallo.  Present for Mr. Ahmad and

8  Mr. Sanchez, Mason Riley and John Kautzman.  The

9  deponent is Dr. Steinberg.  Sir, would you please

10  raise your right hand?

11      ALON STEINBERG, M.D.

12  Having been duly sworn to tell the truth, the whole

13  truth, and nothing but the truth in said cause, testifies

14  as follows:

15      MR. CICCHINI:  And for the record, we are - -

16  this is being conducted by Zoom.  Dr. Steinberg is in

17  California.  And with that, Mr. Kautzman, I will turn

18  it over to you.

19      MR. KAUTZMAN:  Thank you very much, Dan.

20  DIRECT EXAMINATION

21  QUESTIONS BY MR. KAUTZMAN, ATTORNEY FOR THE DEFENDANTS

22      Q.  Good evening.  At least it's evening for

23      me.  Dr. Steinberg, how are you?

24      A.  It's good.  I mean, it's kind of still

25      light outside for me.

## Page 4

1      Q.  Good for you.  I got a stepson that lives

2      in California, so he's already, he's

3      telling me all the time.  I'm saying when

4      are you coming home, and he's like, hey, I

5      came to USC, and I'm not about to come back

6      to Indianapolis, I'll tell you that.

7      A.  How about that?

8      Q.  He loves it.

9      A.  When did he graduate?

10      Q.  God, it was probably 15 years ago.

11      A.  Okay.  My daughter graduated there ten

12      years ago.

13      Q.  Really?

14      A.  And they all want to stay in California.

15      Q.  Yeah, they sure do.  That's unbelievable.

16      So I don't expect tonight to be too long or

17      too burdensome.  This is kind of a general,

18      getting a general sense of what you've

19      reviewed, what your factual basis and

20      opinions are in this matter, what you would

21      intend to offer at trial.  Obviously, if

22      you have any questions, don't hesitate to

23      ask that.  If you need a break, let me

24      know, but it should be pretty

25      straightforward, I would think.  So let me

## Page 5

1      start with your qualifications.  I was

2      provided from Mr. Cicchini a copy of your

3      curriculum vitae.  I presume that that is

4      probably the most up-to-date version that

5      Dan had sent to me a few weeks ago.  It

6      seems to be about four to five pages long.

7      Is that your true and correct curriculum

8      vitae?

9      A.  Yes, sir.

10      Q.  Okay.  And in terms of your qualifications,

11      can you quickly kind of summarize for me

12      what you do and what percentage of time you

13      do those things.  For instance, are you in

14      private practice as a cardiologist, but

15      then are you also doing X, Y, and Z, doing

16      other things?  Can you give me a sense of

17      that?

18      A.  No problem.  I'm a full-time private

19      practice cardiologist.  I'm the chair of

20      the Division of Cardiology in my hospital

21      for the last decade or so.  So that's a

22      small part of administration that I do.  I

23      do some teaching for medical students and

24      residents, which is very small part.  And

25      then I do expert witnessing and consulting

Page 42

1    Q.  So let's talk about those multiple factors.
2    What would you say the factors were that
3    were in play, and how would you attribute
4    percentages to those factors causing death?
5    A.  Okay, factor one was that he was agitated
6    in a high metabolic state, being agitated
7    and a little and probably not - - he was
8    on- compliant with police officers.  That
9    contributed a small percentage to his
10   death.  I would say, we could say, I mean,
11   I would be guessing a percentage, but I
12   would say it's a low percentage is
13   contributing, but it was - - but you need
14   that in order to have prone restrained
15   death, you need one.  If he was complying
16   with police, he wouldn't be placed in prone
17   restraint position.  If he wasn't in a
18   metabolic acidosis and a high catecholamine
19   state and a high metabolic demand state, he
20   probably wouldn't have died in the prone
21   restraint position.  So that is some
22   component.
23   Q.  I'm sorry, is that factor two or factor
24   one?
25   A.  That's factor one.  Factor one and two.  As

Page 43

1    a matter of fact, he was done.  He wasn't
2    able to comply, and he was in a state that
3    he was vulnerable to prone restraint.
4    Q.  Okay.
5    A.  So that's a percentage.  Then there's a
6    percentage of the fact that prone restraint
7    causes a decrease in ventilation.  That's
8    three.  And a decrease in circulation,
9    that's four That's, I would say, the
10   largest percentage.  And then I would say -
11   -
12   Q.  I'm sorry.  Number four would have been the
13   largest percentage.
14   A.  I would say three and four together are the
15   largest percentage combined, because
16   they're all - - they're combined.  When
17   you're prone restrained, you get both a
18   decrease in ventilation and a decrease in
19   circulation.
20   Q.  And the decrease in ventilation and
21   circulation, you find that to be 50 percent
22   of the cause or more or less.
23   A.  At least 50 percent.
24   Q.  So more - - at least 50 percent.
25   A.  Yeah.

Page 44

1    Q.  Okay.
2    A.  And then there's a small component that he
3    was obese, which made him probably more
4    prone to - - the prone restraint position
5    probably caused a worse decrease in
6    ventilation and circulation because he was
7    obese.  There's a percentage there, too,
8    but the vast majority of the percentage is
9    the prone restraint, ventilation and
10   perfusion.
11   Q.  Another thing that was talked about, not
12   talking about the asphyxia issue, but just
13   the potential that there was weight
14   compression, for lack of a better term.  Do
15   you find anything in here, or are you
16   ruling out that certain weight forces were
17   applied to him that asphyxiated him?
18   A.  Again, I mean, I wouldn't say.  I would
19   say, yes, there was some weight force.
20   One, there's weight force that's required
21   to keep a large man down on the ground.
22   Q.  How much you think that is?  How much
23   weight was being applied to him based on
24   what you viewed, or were you able to
25   measure that?

Page 45

1    A.  You know what?  It's difficult to - - it
2    would be very difficult to measure because,
3    you know, in the, at least, in the video,
4    it's hard to tell how hard people were
5    pressing.  In two of the videos, in
6    Matthew's video and in Sanchez's video, it
7    looks like Officer Virt has, at some period
8    of time, one and two knees on Mr. Whitfield
9    and Dr. Kroll, who's, I understand, one of
10   the experts, he wrote a very nice article
11   on knee weight force in police officers.
12   And one knee by itself can cause a 50- to
13   75-pound weight force, and two knees can
14   cause about a 50-pound weight force plus a
15   quarter of the weight of the officer.  So
16   assuming Officer Virt is 200 pounds, I
17   don't know how much he weighs, that he
18   could have exerted anywhere from 50 to 100
19   pounds of a weight force just by himself.
20   I mean, he had a knee on the lower - - the
21   right knee was on the lower back for a
22   period of time, and on the upper back,
23   right side of his back for a period of
24   time.  And that could cause a decrease in
25   his expansion of his lungs, as well as a

12 (Pages 42 to 45)

Page 46

1   decrease in expansion of his diaphragm into
2   his belly because his abdomen was
3   compressed as well as his chest.
4   **Q.  Do you have an opinion as to how much**
5   **weight it would cause for someone to die as**
6   **a result of weight application?**
7   A.  You don't need a certain weight to someone
8   to die.  It's been shown in studies that
9   just being prone could cause about a ten to
10  15 percent decrease in your ventilation.
11  And then there's a hogtie position
12  increases that risk to about 15 to 20
13  percent.  So even without - - What I'm
14  saying is even without a weight force, you
15  could have a decrease in ventilation.  And
16  then there's been a few other studies that
17  have shown that significant weight forces
18  up to, you know, 200, 225 pounds can
19  decrease the ventilation by anywhere from
20  30 percent to 33 percent.  So everyone is
21  different, but there's not a significant
22  amount of weight force.  Dr. Kroll
23  theorizes that the only way people die of
24  prone restrained deaths is by flail chest.
25  And he theorizes that you have to have a

Page 47

1   weight of 570 pounds to basically crack
2   your ribs so you can't breathe.  But what,
3   that's not - - but people die from prone
4   restraint deaths, as we saw here.  And some
5   degree of the weight force likely
6   contributed to his death.  But you don't
7   need a weight force.  You don't need to
8   quantitate how much weight force there is.
9   Everyone's different.  It just depends on
10  multifactors, what their body habitus is,
11  what their condition is, how bad was their
12  metabolic acidosis to begin with, and so
13  weight force is a contributory factor, but
14  it's unknown how much weight, particular
15  weight force was here.  And there's no
16  specific weight force absolutely required
17  to have someone pass away from prone
18  restrained death.
19  **Q.  Let me ask you about a third factor, and**
20  **that is the taser use.  Do you find that**
21  **this gentleman or was there any evidence to**
22  **prove that this person was electrocuted or**
23  **died by some form of electrocution via**
24  **taser?**
25  A.  No, he didn't die from electrocution.

Page 48

1   **Q.  How do you, how do you, if at all,**
2   **contribute the taser use into this entire**
3   **multifactorial situation?**
4   A.  Great question.  And so what sometimes,
5   sometimes when people, from what I
6   understand, he didn't have a complete
7   circuit when they tased him.  They only
8   found on autopsy one barb in him.  So they
9   didn't complete the circuit.  And you could
10  see, when they were using the taser, he
11  didn't have complete neuromuscular kind of
12  collapse.  And it sounds like it just
13  caused him either agitation or pain.  So
14  when people have, when they do complete a
15  circuit, they have involuntary muscle
16  contractions at a very high rate, and that
17  can contribute to the acidosis.  So that
18  theoretically didn't happen here.  Some
19  people who are agitated, like Mr.
20  Whitfield, and get tased, that can
21  contribute significantly to their acidotic
22  state and make them more vulnerable for
23  prone death.  In this case, it probably
24  just caused him more agitation.  It
25  probably did contribute some, but a very

Page 49

1   small amount to his overall metabolic state
2   and agitation because it sounded like he
3   was under increased distress, yelling I'm
4   dying, I'm dying, during his taser.  So did
5   it contribute?  Probably a little, yes.
6   **Q.  And when we say little, are we thinking in**
7   **the range of, you know, 5 percent or less,**
8   **or what do you think?**
9   A.  Sure.
10  **Q.  Okay.  With regard to the acidosis,**
11  **metabolic acidosis, situation, help me**
12  **explain.  Help me understand.  Are you**
13  **saying that the acidosis kicked in or**
14  **became the problem as a result of being**
15  **placed in the prone position or was he**
16  **already susceptible or can people end up in**
17  **an acidotic state without being placed in**
18  **prone, maybe, is a better question.**
19  A.  Yes, sir.  So anyone who exercises like
20  you're going to exercise yourself and you
21  start breathing hard, believe it or not,
22  your breathing is driven not by the demand
23  for oxygen.  You're actually, your
24  breathing is driven by the demand to
25  basically calibrate your system and your

**13  (Pages 46 to 49)**

Page 50

```
1    acidosis.  So when you exercise, you go
2    into an acidosis, and how you compensate
3    for acidosis, you breathe harder to breathe
4    out the carbon dioxide.  Carbon dioxide is
5    a very weak acid, and that's how we
6    compensate for that.  We increase our blood
7    circulation not only to bring oxygen, more
8    oxygen to our muscles, but we also want to
9    take this waste, this carbon dioxide, out
10   of our system.  So we need an increase in
11   cardiac output.  So he was in an acidotic
12   state before being prone by him, basically,
13   by him, you know, you saw him sweating,
14   breathing hard, and then what happened was
15   he ran across the room, he underwent a
16   struggle, he was tased for a short period
17   of time.  All those things contributed to
18   an acidosis.  Dr. Jeffrey Ho did a study
19   that showed that he simulated a police
20   struggle for 45 seconds, and he showed that
21   someone can go to a significant acidosis,
22   normal as pH, which is the level of
23   hydrogen ions or the acid state in the
24   body.  It was around 3., sorry, 7.35.  It
25   went down very low to around 7 after just
```

Page 51

```
1    45 seconds of pretending to struggle with
2    police.  And these are unhealthy
3    volunteers, not someone in a real-life
4    crisis who weighs 400 pounds.  So in this
5    case, he was in an acidosis before being
6    placed in prone restraint.  And then what
7    happened was he wasn't able to compensate
8    for his acidosis by breathing harder and
9    deeper, and he could not circulate his
10   blood as much, and that caused his cardiac
11   arrest.
12   Q.  Let me ask you something with regard to the
13       acidosis.  I know that in some of your
14       literature, your papers, there was
15       reference to the acidosis being measured by
16       pH amounts, and I presume that was done
17       through blood draws or something like that.
18       Do we have any proof in this case, either
19       at autopsy or through any medical
20       interventions of a pH value or something
21       that proves that he was in a metabolic
22       acidosis?
23   A.  That is a great question.  Can, if you want
24       to pause, I could actually.
25   Q.  Sure.  Take your time.
```

Page 52

```
1    A.  I mean.  Oh, I don't have his medical
2        records in front of me.  I didn't - -
3    Q.  And maybe the question I have for you is it
4        can be measured if it's suspected and done
5        right.
6    A.  Yes.
7    Q.  You just don't know in this particular case
8        if that happened.
9    A.  I don't remember in this case, particularly
10       if they had a pH.  I do remember a
11       chemistry on him and I remember his
12       bicarbonate level was low.  I think that
13       would be but, I mean, I would say.  I would
14       say, I don't - - I'm sorry, I apologize.  I
15       can if you - -
16   Q.  That's all right.
17   A.  Now, I could look at the medical records
18       and refresh myself if they measured his pH
19       at all.
20   Q.  Yeah, if you do that and you find out that
21       it affects your opinion at all, will you
22       get that information to Mr. Cicchini, who
23       will forward it to me?
24   A.  Yes, sir.
25   Q.  So let me go into a few more specific
```

Page 53

```
1    questions here.  Let's see.  Oh, kind of a
2    corollary to that question I just asked you
3    about measuring the pH, are there certain
4    findings that you point to in the autopsy
5    report that would be markers or evidence or
6    proof of your theory of what happened?  For
7    lack of a better term, is there certain
8    things that we can point to and identify in
9    the autopsy that says this proves
10   Steinberg's point?  And if so, can you
11   identify that for me?
12   A.  Well, one, there was the autopsy showed no
13       clear other reason to die.  You know, he
14       didn't have a significant - - One, he
15       didn't die of ventricular arrhythmia.  He
16       had an enlarged heart, but there was no
17       other, I would say, significant pathology
18       to point for a cause of asystole.  So
19       logically, the autopsy said it was a, you
20       know, what it said.
21   Q.  So what I hear you saying - - I
22   A.  It's not like he had a big blood clot in
23       his arteries of his heart.  It's not like
24       he had a big clot in his lungs or fluid
25       around his heart or fluid, you know, air in
```

## Page 78

1  whole time, he was prone restrained, I
2  can't fully tell from the videos, but there
3  was definitely - - he had a significant
4  weight force, and I outlined how much
5  potential weight that was. Then, you know,
6  Officer Sanchez had some degree of weight
7  force holding down his head and some degree
8  of his shoulders. I don't know to what
9  degree, but there were some. Officer Ahmad
10 also had his hands over there. There was
11 some period of time. Also, Officer
12 Matthews also had some weight force holding
13 him down. It's unknown how much that is.
14 At some period of time, they were
15 handcuffing the guy. They may not have
16 been placing as much weight force during
17 that period because they were working on
18 his handcuffs. I know Officer Dominique
19 Clark had her hands in there for a brief
20 period of time. I don't know if it was
21 just to hold the hands or she placed some
22 weight force, so it's unclear. But there
23 was at least four officers that created
24 some degree of weight force on Mr.
25 Whitfield.

## Page 79

1  **Q. And do you agree with statements from your**
2  **previous literature that an initial ECG**
3  **rhythm of or a PEA or asystole after a**
4  **cardiac arrest is generally inconsistent**
5  **with a primary cardiac causation?**
6  A. It usually isn't, but it can be. Usually
7  we see PEA and asystole and cardiac
8  problems in people who have, let's say,
9  heart attack and heart perforates.
10 Sometimes when they damage their valve and
11 there's a severe mitral valve or aortic
12 valve leaks, sometimes we see PA or
13 asystole, or someone who has a massive
14 heart attack, a blockage of his left main
15 coronary artery, sometimes we see those
16 rhythms, but the primary rhythm we usually
17 see, in my experience, is in ventricular
18 arrhythmias. In my career, usually we're
19 in the cath lab, we create ventricular
20 arrhythmias, not asystole PA. When I
21 exercise people who have heart disease and
22 do stress testing, we don't see people
23 going to PA or asystole. We see people
24 going into ventricular arrhythmias.
25 **Q. But people can have asystole from a primary**

## Page 80

1  **cardiac event.**
2  A. They can, but it wouldn't be in a case like
3  Mr. Whitfield.
4  **Q. Okay. Do you know, I think you cited him**
5  **in your literature. You know, do you**
6  **either know or know of Dr. Mark Kroll?**
7  A. Yeah, I know.
8  **Q. Do you have an opinion as to his**
9  **credibility within the academic field?**
10 A. I don't. I just know he's an electrical
11 engineer and he does - - he's a consultant
12 or works for Axon and has done a lot of
13 trials on Taser use. That's all I know.
14 And he's published in the literature.
15 **Q. And it's fair to say you've actually cited**
16 **his publications before, right?**
17 A. I've cited three of his studies in my
18 original article.
19 **Q. All right, and what about a forensic**
20 **pathologist by the name of Dr. Bill Smock.**
21 **Do you know him?**
22 A. No.
23 **Q. Okay.**
24 A. The name sounds familiar. He may have been
25 involved in a prior case that I worked on,

## Page 81

1  but off the top of my head, I don't know.
2  Is he a pathologist or an emergency room
3  doctor?
4  **Q. Pathologist.**
5  A. Okay.
6  **Q. I mean, once again, I don't know all the**
7  **different disciplines he may be involved**
8  **in, but I know by trade he's a forensic**
9  **pathologist.**
10 A. Okay.
11 MR. KAUTZMAN: Let's see what else. I believe
12 that's all I have. Mason, before I let the deponent
13 go, is there anything else we need to talk about
14 before I conclude my questions?
15 MR. RILEY: I don't think so, John.
16 MR. KAUTZMAN: Okay. Thank you very much, sir.
17 Appreciate your time. Sorry for the lateness of the
18 hour.
19 DR. STEINBERG: I'm sorry. I really appreciate
20 you guys accommodating for me. I have a very busy
21 practice. I thank you for waiting this late so I
22 could do my work day and then do this afterwards. So
23 thank you.
24 MR. KAUTZMAN: No problem. Don't worry about
25 it, Dan. Anything else for tonight, by the way?

Page 82

1     DR. STEINBERG:  Do I send my bill to Dan or to
2  you?
3     MR. KAUTZMAN:  Well, send it to Dan, and then
4  Dan and I might fight over after that.
5         END OF RECORDING
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 83

1         C E R T I F I C A T E
2  State of Indiana)
3  County of Marion)
4
5     I, Suzanna K. Cable, Court Reporter,
6  hereby certify that the above and foregoing is a
7  complete and accurate transcription of a recording
8  given to me by MASON RILEY, Esq.
9     WITNESS my hand and seal this the 1st day
10  of July 2024.
11
12
13
         Suzanna K. Cable
14
15    My Commission Expires: August 28, 2025.
16
17
18
19
20
21
22
23
24
25
26
27
28

Page 84

1      READING AND SIGNING BY DEPONENT
2
3     I, ALON STEINBERG, M.D., after reading my
4  deposition and noting any corrections on the errata
5  sheet along with the page and line number, certify
6  the same to be true and correct to the best of my
7  knowledge and recollection.
8
9       This _____ day of _____, 2024.
10
      _____
11
         ALON STEINBERG, M.D.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

22 (Pages 82 to 84)