UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THE ESTATE OF HERMAN WHITFIELD, III, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:22-cv-01246-SEB-MJD |
| THE CITY OF INDIANAPOLIS, et al., | ) ) | |
| Defendants. | ) ) | |

**ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Now before the Court are the Motions for Summary Judgment filed by Defendants

Steven Sanchez and Adam Ahmad [Dkt. 165] and Defendants the City of Indianapolis

(the "City"), Jordan Bull, Dominique Clark, Nicholas Mathew, and Matthew Virt [Dkt.

169], respectively.  Plaintiff The Estate of Herman Whitfield, III has brought this action

against Defendants, pursuant to 42 U.S.C. § 1983 and Indiana state law, alleging that the

individual Defendants, all police officers with the Indianapolis Metropolitan Police

Department ("IMPD"), violated the Fourth Amendment when they used excessive force

and/or failed to intervene to prevent the use of excessive force against Herman Whitfield,

III ("Mr. Whitfield"), in responding to his mental health crisis, which resulted in his

death.  Plaintiff further alleges that the City of Indianapolis is liable for failing to properly

train its officers to respond to mental health crises and/or to discipline its officers when

they do not follow their training.  Finally, Plaintiff has asserted claims for battery and

negligence under Indiana law. For the reasons detailed below, Defendants' Motions for Summary Judgment are <u>GRANTED IN PART AND DENIED IN PART</u>.

**Factual Background**

I.      **The Events of April 25, 2022**

In the early morning hours of April 25, 2022, Mr. Whitfield's mother, Gladys Whitfield, phoned 911 from the residential address of 3720 Marrison Place in Indianapolis, Indiana, where Mr. Whitfield resided with his parents, to request assistance for her son whom she described to the 911 dispatcher as experiencing "some sort of episode." Dkt. 171-1. In response to the 911 dispatcher's inquiries, Mr. Whitfield's mother clarified that he was suffering "a mental issue" and that her son "doesn't do drugs." *Id.* The 911 call was dispatched to responding officers as a "domestic disturbance"; additional information notified them that the "father is arguing with son … can hear son rambling in the background sounds very poss mental/emotional." Dkt. 171-2. When the officers arrived, they found Mr. Whitfield naked, sweaty, talking gibberish, and failing to respond to his parents' requests to put on his clothes. G. Whitfield Dep. at 11, 24, 61; H. Whitfield Jr. Dep. at 53. At one point prior to the officers' arrival, Mr. Whitfield reportedly had tried to hug his mother while he was naked, causing Mr. Whitfield's father, Herman Whitfield, Jr., to slap Mr. Whitfield in the face for what his father believed to be inappropriate behavior. H. Whitfield Jr. Dep. at 54, 57. That strike caused Mr. Whitfield's lower lip to bleed. Sanchez IA Stmt. at 13.

Officers Ahmad and Clark were the initial respondents to the 911 call. Officers Bull and Mathew arrived three minutes later; and Officers Sanchez and Virt arrived three

2

minutes after that.  Dkt. 171-10 at 7, 9, 12.  All six officers wore activated body cameras that captured much of their interactions with Mr. Whitfield and his parents.  Video Comp.[1]

Upon arrival, Officer Ahmad spoke first with Mr. Whitfield's father, who stated that his son was experiencing a "psychosis" and remarked that the officers should have brought an ambulance.  H. Whitfield Jr. Dep. at 58–59; Video Comp. at 0:40–0:46; Ahmad Bodycam at 2:36.  Based on this information, Officer Clark, a member of IMPD's Behavioral Health Unit and trained Crisis Intervention officer, called for medics to respond and stage outside the home.  Cummings Dep. at 14, 59; Clark Bodycam at 2:47. The officers determined that an immediate detention of Mr. Whitfield was warranted based on his psychiatric symptoms and the information provided by his parents.  Dkt. 171-8 at 353 (Officer Bull testimony); 412 (Officer Virt testimony); 675 (Officer Sanchez testimony); 767–68 (Officer Ahmad testimony).  Because he needed to be immediately detained, the officers sought to place Mr. Whitfield in handcuffs and to secure him before the responding medics would enter the house to provide treatment.  *Id.* at 768–69.

When the officers arrived, Mr. Whitfield, whose height was 6'3" and weight 389 pounds, was standing in the hallway where he could be seen from the front door entrance, as the officers gathered.  He was naked, obese, visibly sweating profusely, incoherent, and making abrupt and erratic movements, moving from place to place in the house often

---

[1] Plaintiff has submitted a video compilation of the six officers' body camera videos, which will be referenced as "Video Comp."  The individual officers' body camera videos will be referenced as "[Officer Last Name] Bodycam."

outside the view of the officers positioned just inside the front door.  Video Comp. at 0:50–5:00.  When Officer Clark entered the residence, she expressed her concern that Mr. Whitfield was holding a bottle of bleach in his hand, though thereafter, he put it down and did not pick it up again.  Clark Bodycam at 3:07; Dkt. 171-8 at 88, 134.  For approximately ten to twelve minutes, Officers Clark and Ahmad along with Mr. Whitfield's mother attempted to coax Mr. Whitfield to put on clothes so he could get into the ambulance and be taken to the hospital.  During this time, Officer Clark spoke to Mr. Whitfield to ask him to put on "some shorts" and said she had "some people coming to talk to [him]."  Video Comp. at 3:06–3:09.  Mr. Whitfield's responses to Officer Clark were nonsensical.  Video Comp. at 0:50–7:25.

After Officer Clark's attempts to get Mr. Whitfield to comply with her commands were unsuccessful, she requested of Officer Ahmad that he try to gain his compliance. Dkt. 171-8 at 770.  Officer Ahmad spoke with Mr. Whitfield, saying, "hey, bud," and asking, "what's going on with you?"  Ahmad Bodycam at 2:43, 10:14.  As Officer Ahmad spoke with Mr. Whitfield, he continued to move quickly throughout the house, alternating between yelling incoherently and being completely silent.  Dkt. 171-8 at 770–71.  Officer Ahmad noticed that Mr. Whitfield's mouth was bleeding and asked what had caused that. Ahmad Bodycam at 8:40, 10:48.  Mr. Whitfield's father informed Officer Ahmad that he had hit Mr. Whitfield prior to the arrival of the officers.  *Id.* at 10:52; Dkt. 171-8 at 790.

Approximately nine minutes after the arrival of the officers, Mr. Whitfield entered into his bedroom, sat silently on the bed, with his hands on his knees, staring off into space.  Video Comp. at 9:00.  He made no response to the repeated requests from his

parents and the officers to put on clothes.  Mr. Whitfield's parents followed him into the bedroom to continue to encourage him to get dressed.  Officer Ahmad positioned himself outside of the bedroom and shone his flashlight on him, but Mr. Whitfield continued to give no reaction or response.  Video Comp. at 9:00, 10:00–11:50.  Mr. Whitfield remained sitting on the bed for approximately three minutes, when he suddenly stood up, and moved quickly out of his bedroom, brushing past his father and Officer Ahmad as he did so, and proceeding down the hallway away from the officers and into the kitchen.  *Id.* at 11:55–14:08; Ahmad Dep. at 5-8.

Officer Ahmad and Mr. Whitfield's father followed Mr. Whitfield into the kitchen, a location that was out of view to the remaining officers.  Video Comp. at 12:07.  Mr. Whitfield's mother, who was in the hallway next to the kitchen, was startled when Mr. Whitfield came past her, prompting her to emit a loud scream.  *Id.*  After Mr. Whitfield had entered the kitchen, Officer Ahmad heard (but did not see) the banging and clattering of pots and pans, unsure if Mr. Whitfield had knocked them over as he entered the kitchen or if they had already been on the ground when Mr. Whitfield ran into them.[2] Ahmad Dep. at 24–25.  During this time, Mr. Whitfield, as captured on the body cam audio, repeatedly said the word "water,"  but no one specifically inquired of Mr. Whitfield if he wanted water. Video Comp. 12:43–13:15; 14:20–25.

---

[2] Officer Ahmad testified that he had previously noticed parts of the house in disarray when he arrived at the residence, including a broken mirror in a frame and "a couple things thrown about," so he "couldn't know for certain if [Mr. Whitfield] had knocked [the pots and pans] down prior to [Officer Ahmad's] arrival or right when he [entered the kitchen]."  Dkt. 171-8 at 774.

Officer Ahmad testified that he was trying to maintain a distance from Mr. Whitfield at the time in an effort to get him to comply with the officers' directives, to prevent the officers from having "to go hands-on with him." Dkt. 171-8 at 775. Officer Ahmad said to Mr. Whitfield that he needed to "relax," but when Mr. Whitfield reached into the pile of pots and pans in the kitchen, Officer Ahmad spoke in a louder, more assertive tone, directing Mr. Whitfield to "put that down." *Id.* Officer Ahmad testified that, despite his instructions, Mr. Whitfield continued to reach into the pile of pots and pans, which gave Officer Ahmad concerns about whether Mr. Whitfield might try to grab something to wield. This prompted Officer Ahmad to shout to Mr. Whitfield, telling him to "stop trying to pick stuff up." In the process, Officer Ahmad reached out toward Mr. Whitfield's hand to stop him from grabbing something. *Id.* As Officer Ahmad reached toward Mr. Whitfield, Mr. Whitfield backed away, moving towards the doorway between the kitchen and the dining room, and without holding anything in his hands. *Id.* at 24–25.

Officer Ahmad concedes that Mr. Whitfield made no threatening gestures towards him while they were together in the kitchen, nor had Officer Ahmad observed Mr. Whitfield to verbally or physically threaten anyone else. Ahmad Dep. at 26–27. Officer Ahmad never unholstered his taser, acknowledging that he had no basis to attempt to stop Mr. Whitfield in the kitchen with either a taser or baton strike. *Id.* at 31.

When Officer Sanchez heard the noise coming from the kitchen, he positioned himself in the living room, facing the dining area in an effort to prevent Mr. Whitfield from coming back around the inside pathway of the house or possibly running outside of

the house. Dkt. 171-8 at 676. (The dining room was connected to the kitchen by an open doorway and completely open to the living room, beyond which was located the front door of the home.) Officer Virt also moved into the living room following behind Officer Sanchez. Officer Sanchez drew his taser and trained it on the open space between the kitchen and the dining room, with its red laser dot focused on the spot where Mr. Whitfield would emerge if he exited the kitchen through that opening into the dining room area. Sanchez Bodycam at 5:22. Officer Sanchez testified that he had drawn his taser because he had heard the crashing sounds coming from the kitchen as well as Officer Ahmad's directives to Mr. Whitfield to stop what he was doing and to drop and/or not pick up items. Because Officer Sanchez could not see directly into the kitchen from his position in the living room, he did not know what precisely Mr. Whitfield might have grabbed. Dkt. 171-8 at 676. At this point, Officer Mathew, who was located near the doorway off the hallway where Mr. Whitfield originally had entered the kitchen, also drew his taser. *Id.* at 309.

Mr. Whitfield twice poked his head out of the kitchen doorway after which he backed out of the kitchen and entered the dining room. *Id.* at 677; Sanchez Bodycam at 5:27–5:28. Mr. Whitfield was still nude and his hands were empty. *Id.* at 5:27–5:29. The body camera video reveals that, as Mr. Whitfield exited the kitchen moving backwards, he turned to his left to face the living room, and took a few quick steps forward into the dining room towards the front of the dining room table in the direction where Officer Sanchez was positioned. Sanchez Bodycam at 5:28–5:29. As Mr. Whitfield moved forward from his location in the dining room, Officer Sanchez, who was

7

located in the living room, tased him in probe mode.  *Id.*; Virt Dep. at 28.  Officer Ahmad had not yet emerged from the kitchen when Officer Sanchez deployed his taser.  Sanchez Bodycam at 5:28.  Prior to deploying his taser, Officer Sanchez neither ordered Mr. Whitfield to stop nor warned Mr. Whitfield that he would deploy the taser if Mr. Whitfield did not stop.  *Id.* at 5:27–5:28; Video Comp. at 14:27.

Officer Virt, who was positioned immediately behind Officer Sanchez's right shoulder when Officer Sanchez discharged his taser, has testified that he believed that Mr. Whitfield was "gonna' go to try to get away from everyone in the home … [s]pecifically the officers."  Virt IA Stmt. at 11.  Officer Sanchez concedes that, at the time he deployed his taser, he had not seen or heard Mr. Whitfield physically or verbally threaten anyone and that it is possible that Mr. Whitfield could have been attempting to avoid him as he moved about the house.  Nonetheless, Officer Sanchez believed at the time that it would have been unsafe for him to wait and see what Mr. Whitfield intended to do, as Mr. Whitfield was quickly advancing toward him.  Sanchez Dep. at 21, 25, 29–30.  Officer Sanchez testified that his intent was to use the taser to incapacitate Mr. Whitfield in order to facilitate handcuffing as Mr. Whitfield, who was a "large man" compared to himself, who at only 5'8", "wasn't going to stop him."  *Id.* at 29.

The first tase did not fully incapacitate Mr. Whitfield.  The tase caused Mr. Whitfield to turn to his left and stumble around the front of the dining room table, away from the officers, as he shouted, "Fire!  Fire!  Fire!"  Sanchez Bodycam at 5:30–5:35.  Mr. Whitfield bumped into the front of the dining room table and other furniture in the dining room and fell to the ground, landing in a sitting position facing the living room,

with the right side of his body, including his right arm, partially underneath the dining room table. The body camera video shows that, once on the floor, Mr. Whitfield lifted his right arm out from under the table in a frantic movement, causing the tablecloth to be pulled down off the table, and the vases and other glassware that were located on the table to crash down around Mr. Whitfield. Ahmad Bodycam at 14:15–15:13. Officer Virt testified that he believed in that moment that Mr. Whitfield was attempting to throw something at the officers; only later did he learn that he was enveloped in and trying to cast off the tablecloth. Dkt. 171-8 at 380.

After Mr. Whitfield had fallen to the floor, he continued flailing and thrashing. Officers Ahmad, Sanchez, Mathew, and Virt converged on him in an attempt to handcuff him, during which encounter Mr. Whitfield and the officers became entangled in the tablecloth, adding to the difficulty of their execution of the handcuffing procedure. Officers Clark and Bull, who had moved into the vicinity of the dining room where this chaos was playing out, did not place their hands on Mr. Whitfield.

Officer Ahmad grabbed Mr. Whitfield's arm and moved him onto his stomach in a prone position in order to try to handcuff him, stating, "Bud, I need you to relax." Ahmad Bodycam, 14:04–14:09. As Mr. Whitfield continued flailing and thrashing and was still tangled in the tablecloth, he yelled, "Oh my god! I'm dying, I'm dying! I'm dying! I'm dying!" Video Comp. 14:35–14:45. Officer Sanchez tased Mr. Whitfield again, this time on his leg, in the drive stun mode. Sanchez Dep. at 25, 30–31. During the period that Mr. Whitfield lay on his stomach as the officers attempted to handcuff him, the body camera video records him crying out, "God, cannot breathe, can't breathe, can't breathe,

can't breathe!" Video Comp. at 15:13, 15:16, 15:37, 15:44. None of the officers recalls
hearing Mr. Whitfield saying that he was unable to breathe.

The handcuffing procedure was impeded by several other complicating factors,
including that Mr. Whitfield's obesity, his naked, sweaty body, and, as noted above, his
flailing and thrashing about while tangled in the tablecloth. Glassware and other debris
cluttered the floor as well as several pieces of furniture, which, according to Officer
Ahmad, made it more difficult to maneuver Mr. Whitfield into a "good cuffing position."
Dkt. 171-8 at 779. In all, it took approximately 80 seconds to secure the handcuffs on
Mr. Whitfield's wrists, which required two sets of handcuffs to accommodate his size.
Once Mr. Whitfield was handcuffed, his thrashing and yelling ceased, and Officer Clark
radioed for paramedics to enter now that the scene had been secured. She advised
everyone within earshot that the paramedics would be pulling up "any second." Ahmad
Bodycam, 17:05.

During handcuffing, Mr. Whitfield was lying on his stomach. Officer Mathew
placed one of his knees on Mr. Whitfield's left thigh, while grabbing Mr. Whitfield's right
leg to lift it up and move forward toward Mr. Whitfield's back, as Officer Mathew placed
his other hand on Mr. Whitfield's lower back. After cuffing, Officer Mathew maintained
this position until the medics arrived. Mathew Bodycam at 12:20–15:12; Mathew Dep. at
39–42, 44. During handcuffing, Officer Virt was located on Mr. Whitfield's left side,
with knee on Mr. Whitfield's lower back, which he did not remove until shortly after the
handcuffing process had been completed. Virt Dep. at 34; Virt Bodycam at 12:53–1302.
Officer Sanchez took hold of Mr. Whitfield's arm for handcuffing, and, after cuffing,

placed his hand on Mr. Whitfield's head, "making sure his head was just faced, faced away from us." Sanchez IA Statement at 17.

In his internal affairs report, Officer Ahmad stated that he had pushed down on Mr. Whitfield's upper back during handcuffing and kept his hands on Mr. Whitfield after he was handcuffed to "make sure he couldn't get up." Ahmad IA Statement at 15, 17. Following the handcuffing, Officer Ahmad was located on Mr. Whitfield's right side, next to his head. Officer Ahmad's left knee was positioned under Mr. Whitfield's right shoulder, such that Mr. Whitfield's right shoulder was slightly elevated off the ground. Officer Ahmad's left arm was looped under Mr. Whitfield's right arm, while Officer Ahmad's left elbow and left hand rested on Mr. Whitfield's middle back. Officer Ahmad maintained this position until the paramedics arrived. Video Comp. at 16:20–19:00. The parties dispute whether the officers placed any weight pressure on Mr. Whitfield during and after handcuffing, and, if so, how much.[3]

Once Mr. Whitfield was handcuffed and subdued, he remained lying on his stomach for nearly four additional minutes, during which time he neither moved nor spoke. IMPD IA Report at CITY_0044992. Approximately 90 seconds after the

---

[3] Plaintiff's expert, Dr. Alon Steinberg, opined that the use of weight force on a prone subject can cause a significant decrease in ventilation, and that, based on his review of the body camera footage, he believes that the officers "had some degree of weight force on Mr. Whitfield," (Dkt. 178-2 at 5), although the amount of weight force "is unknown" and "would be very difficult to estimate." Dkt. 171-13 at 12. Defendants maintain that they did not apply any significant weight force on Mr. Whitfield and that the officers had their hands on Mr. Whitfield only for "indexing" purposes, a term that refers to the placement of a hand on a suspect in order to feel motion or movement. Dkt. 171-8 at 651–53 (Sgt. Damon Young testimony); 688 (Officer Sanchez testimony); 781 (Officer Ahmad testimony). Defendants have sought the exclusion of Dr. Steinberg's testimony regarding weight force, which issue we address further below.

handcuffing, Officer Mathew, who was at the time a rookie officer, asked other senior officers about whether Mr. Whitfield should be rolled off his stomach into a recovery position on his side.  IMPD IA Report at CITY_0044992.  Officer Ahmad declined to roll Mr. Whitfield to his side, stating, "No, I don't want him to get up again."  Sanchez Body Cam, 8:47.  Officer Ahmad testified that he was concerned about Mr. Whitfield's return to an agitated state as he had been prior to handcuffing.  Dkt. 171-8 at 788.  Officers Sanchez and Virt both testified that they agreed with Officer Ahmad's judgement in this regard.  *Id.* at 701–03; 787–88.

Officer Ahmad testified that during the period that Mr. Whitfield was handcuffed on his stomach he "constantly" checked to ensure that Mr. Whitfield's face was to the side, that his mouth and nose were not obstructed, and that he did not vomit or aspirate. Dkt. 171-8 at 783.  Officer Ahmad assumed that when Mr. Whitfield stopped moving and speaking following the handcuffing that he had either returned to the "catatonic" state that Officer Ahmad had previously observed him to exhibit while in his bedroom, or that he had simply "give[n] up the fight," or that he had passed out from some sort of intoxicant. Dkt. 171-8 at 789.  Officer Ahmad assumed that Mr. Whitfield was breathing since no outward observable signs of medical distress presented.  However, Officer Ahmad did not check Mr. Whitfield's pulse or specifically check to confirm that he was still breathing. *Id.* at 790, 803, 811.  Officer Sanchez testified that he, too, did not observe any signs of Mr. Whitfield's being in medical distress; he assumed that Mr. Whitfield had simply stopped resisting the officers' attempts to handcuff him.  *Id.* at 686.  Officers Mathew and Bull, both of whom had previously been employed as medics, likewise did not believe

that Mr. Whitfield was in medical distress at the time. *Id.* at 316, 327; Mathew Dep. at 5, 7; Bull Dep. at 6, 38.

Following Mr. Whitfield's handcuffing, his mother asked the officers, specifically, whether he had been tased and whether he was conscious. The officers replied, "it's nothing but a little shock," "he's fine," and "all it does is make his muscles tense up so that he can't continue thrashing around." Sanchez Body Cam at 9:20–36. Mr. Whitfield's mother asked whether Mr. Whitfield was breathing, and Officer Clark assured her that he was, without checking to confirm whether he was, in fact, breathing. Dkt. 178-8 at 26–27.

Paramedics entered the front door of the home approximately one minute and 40 seconds after Mr. Whitfield was handcuffed. Dkt. 178-10 at CITY_004977. Upon arrival, the medics asked a few preliminary questions of Mr. Whitfield's parents and the responding officers before directly checking on Mr. Whitfield's situation, approximately one minute and 30 seconds after entering the home. *Id.* When Mr. Whitfield failed to respond to the paramedics' repeated attempts to communicate with him and medics were unable to find a pulse on Mr. Whitfield, the medics requested that the officers uncuff Mr. Whitfield and roll him onto his back, nearly four minutes after he was handcuffed. *Id.* To do so, the officers first had to move the dining room table and remove objects from the floor to create sufficient space to maneuver Mr. Whitfield from his stomach to his back, at which point paramedics immediately commenced CPR. Virt's Bodycam at 10:45–10:54, 11:43–11:53. The paramedics inquired as to any drug use by Mr. Whitfield, prompting Officers Clark and Virt to enter Mr. Whitfield's bedroom where they located

discarded Delta 9 THC gummy packages, which they presented to the medics.  Dkt. 171-8 at 393–94.  Paramedics performed CPR on Mr. Whitfield for several minutes but sadly were unable to revive him.  Mr. Whitfield was transported by ambulance to a hospital where he was pronounced dead.

The Marion County Coroner conducted an investigation and autopsy and determined that Mr. Whitfield died from "[c]ardiopulmonary arrest in the context of law enforcement subdual, prone restraint, and conducted electrical weapon use."  Coroner's Autopsy Report 1.  The Coroner noted the contributing factors of morbid obesity and hypertensive cardiovascular disease.  *Id.*  Mr. Whitfield was found to have an enlarged heart and an elevated level of THC in his blood, which facts were unknown to the officers at the time they detained Mr. Whitfield.

## II.    IMPD Policies and Officer Training

IMPD's training for recruits and veteran officers includes, among other topics, training on the law, firearms, use of force, mental illness, ethics, and de-escalation.  Recruits undergo training for about six months at IMPD's training academy, during which time they are taught about IMPD's directives, regarding limitations on the use of force.  Cummings Decl. ¶¶ 9–10, 13–14.[4]  Recruits engage in survival tactics training exercises two to three times per week, which includes IMPD's general orders governing the use of

---

[4] Defendants object to Plaintiff's designation of IMPD Assistant Chief Catherine Cummings as an expert witness without her consent, arguing that, because she was involved in the underlying incident giving rise to this lawsuit, she must be treated as only a fact witness.  Because Defendants do not object to the substance of her testimony, only whether she can be identified as an expert before the jury, we do not rule on this objection at this time.

force, appropriate uses of force, and the proper application of IMPD-approved force techniques as well as de-escalation techniques. *Id.* ¶¶ 12, 14. IMPD recruits receive about 310 hours of use-of-force and de-escalation training during their terms at IMPD's training academy, including 12 hours of classroom instruction solely on the legal framework regarding the use of force. *Id.* ¶ 15.

Recruits are taught *inter alia* to recognize that any use of force must be objectively reasonable and proportionate to the circumstances, and are instructed to balance the nature of the government's interest in a seizure against the citizen's right to be free from unreasonable force when force is necessary. Dkt. 171-3. IMPD's General Order 1.30, titled "Use of Force—Principles," provides that "[o]fficers will attempt to de-escalate situations with the goal of resolving encounters without the use of force, when feasible." Dkt. 171-3 at 1 (emphasis removed). General Order 1.30 lists "the use of communication, time, distance, barriers, and continual situational awareness" as examples of de-escalation techniques." *Id.*

In determining whether to use force and, if so, the amount of force, General Order 1.30 instructs officers to consider, among other things, the severity of the crime, the proximity and availability of weapons to the suspect, whether the suspect is actively resisting, whether the suspect poses an immediate threat to the officer or others, whether de-escalation techniques are feasible, known physical, medical, or mental impairments that hinder compliance, the number of suspects to officer, size difference, skill set differences, and duration of incident. *Id.* at 2. General Order 1.30 further provides in relevant part that "[o]fficers may not use or threaten to use force … [s]olely to resolve a

situation more quickly absent other factors that would make the use of force objectively reasonable and proportional" or "[t]o force compliance with an officer's request, absent other factors that would make the use of force objectively reasonable and proportional …." *Id.* at 3.

General Order 1.30 provides that "[a]s soon as reasonably possible following a use of force, officers will evaluate the subject for injuries, request Emergency Medical Services (EMS) as needed or requested, and render appropriate aid according to their training and experience." *Id.* at 4. Additionally, General Order 1.30 states that officers are to "[p]lace prone subjects in an upright or recovery position, when appropriate and feasible" and "[c]ontinually observe subjects for signs of distress." *Id.* Finally, General Order 1.30 provides that "[o]fficers will not restrain subjects who are in custody and under control in a manner that restricts their ability to breathe, and shall reposition the subject into a recovery position as soon as practical." *Id.*

Regarding the use of tasers, IMPD's General Order 1.32, titled "Less Lethal Devices," provides in relevant part that, "[w]hen feasible, officers must give a verbal warning prior to the use of [a taser] to the subject and other officers." Dkt. 178-25 at 1. The Taser Policy further provides that "[t]he act of fleeing, without other factors involved, does not justify the use of [a taser]." *Id.* at 3. IMPD officers are also instructed that, if a person is unresponsive after the deployment of a taser, officers should immediately initiate EMS/CPR protocols. Dkt. 178-33.

IMPD Preliminary Order 8.1, titled "Prisoner Handling, Transportation, and Escape," addresses positional asphyxia and the need to move detainees to the recovery

position.  The version of Preliminary Order 8.1 in effect at the time of the events underlying this litigation defines "positional asphyxia" as "[a] condition in which the position of the body interferes with normal respiration and causes an extreme decrease in the mount of oxygen in the body accompanied by an increase of carbon dioxide which may lead to loss of consciousness and death." Dkt. 178-27.  Preliminary Order 8.1 provides that "[o]fficers should avoid leaving any prisoner on their chest or stomach for any period of time longer than is absolutely necessary, regardless of the type of restraint used," and that "[t]he subject should be moved onto their side, allowing less interference with normal breathing, as soon as possible." *Id.*  Preliminary Order 8.1 also lists several factors that create a "greater risk of positional asphyxia" when an individual is placed in a prone position, including but not limited to, "[b]izarre, aggressive, violent behavior outside the norm," "[s]houting and screaming, especially at inanimate objects," "[p]rofuse sweating," "[t]hrashing after restraint," "[p]aranoia," "[s]hortness of breath," and/or "[k]nown drug overdose." *Id.*  Preliminary Order 8.1 states that "[a]ny detained subject exhibiting some or or all of the above symptoms must be closely monitored." *Id.*

IMPD trains its officers regarding the "risk factors" of "in custody death syndrome" to include "[o]besity, bizarre behavior, shouting and screaming, profuse sweating … thrashing after restraint" and directs officers to "not place prisoner in prone position after restraining." Dkt. 178-31.

IMPD recruits are also trained on how to respond to persons with mental health problems, and to recognize, respond to, and de-escalate situations involving individuals with a mental illness.  IMPD's General Order 4.7, titled "Mental Health Crisis Response,"

states that, "[w]hen required to engage with a subject in a mental health crisis, IMPD employees will use appropriate de-escalation techniques, when feasible." Dkt. 178-26 at 1. The Mental Health Crisis Response Policy further instructs officers that, when dealing with an individual experiencing a mental health crisis, "they must: … [a]ttempt to de-escalate the situation by," among other things, "[a]ssuming a quiet and nonthreatening voice and manner," "slowing down the situation," "[r]eassuring the individual that officers are there to help them," "[c]ommunicating with the individual to determine what is bothering them," and "[u]sing active listening skill and emotional labeling." *Id.* at 2. IMPD trains that "officers who encounter an unarmed and minimally threatening individual who is exhibiting conspicuous signs that he is mentally unstable must de-escalate the situation and adjust the application of force downward." Dkt. 178-29.

Recruits must demonstrate that they understand IMPD's directives, practices, and procedures to graduate from IMPD's training academy. Cummings Decl. ¶ 17. After recruits complete their time at the training academy, they become probationary officers and complete an FTO (field training officer) training process. *Id.* ¶ 21. During the FTO training process, field training officers supervise probationary officers and assist them in applying the lessons they learned at the training academy in the field, including use of force. *Id.* ¶¶ 22–23. During the FTO process, the field training officers monitor and evaluate the probationary officers, and probationary officers who do not meet IMPD standards during their probationary year are terminated. *Id.* ¶¶ 26–27. After completing the FTO training process, IMPD officers receive additional in-service training annually

18

on various topics including, firearms, survival tactics, use of force, Indiana law, and

investigation techniques. *Id.* ¶¶ 35–36, 39.

### III.     IMPD's Internal Affairs Investigation and Findings

IMPD officers are required to notify a supervisor via communications as soon as

practical following a use of force incident resulting in serious bodily injury. *Id.* ¶ 44.

When the IMPD receives a complaint of misconduct regarding a use of force, the

complaint goes to Professional Standards, who decides whether it should be investigated

by the Special Investigations Unit ("SIU") (for alleged violations of statutory law),

Internal Affairs (for alleged violations of IMPD directives), or a district (when additional

factfinding is required). *Id.* ¶¶ 46, 50–54.  If a district-level investigation raises

additional concerns about an incident, Professional Standards may then transfer the

investigation to SIU or Internal Affairs.  If a complaint alleges that an officer engaged in

criminal conduct, the complaint is generally sent to SIU for a criminal investigation, after

which the SIU recommends whether to pursue criminal charges.  When a complaint is

sent to Internal Affairs, it is investigated by IMPD officers who focus solely on

conducting administrative investigations concerning alleged violations of IMPD

directives.  Once the investigation is complete, the Internal Affairs investigators provide

all factual evidence that is gathered to the Commander of Internal Affairs who prepares a

report recommending a finding of Exonerated, Unfounded, Not-Sustained, or Sustained

for each allegation of the complaint.

Here, IMPD's Internal Affairs Division conducted an internal review of Mr.

Whitfield's death and concluded as follows:

A review of the incident by Officer Damon Young concluded Officers Sanchez, Ahmad, Virt, Clark, and Bull did not follow policy or department training when they did not move Herman Whitfield III from the prone position to his side.  Officer Young concluded Officer Mathew's suggestion to move Herman Whitfield III to his side followed policy and training.

Based on the results of this investigation, the Office of Internal Affairs recommends sustained findings for Officers Sanchez, Ahmad, Virt, Clark, and Bull.  Officer Clark stood behind Officer Virt and Officer Sanchez in a position to observe Herman Whitfield III laying on his stomach in handcuffs for 1 minute and 27 seconds.  Officers Ahmad, Sanchez, Virt, and Bull left Herman Whitfield III handcuffed in the prone position for 3 minutes and 51 seconds until medics requested, they roll him over.  Officers Sanchez, Ahmad, Virt, Clark, and Bull did not attempt to facilitate the movement of Herman Whitfield III onto his side to allow less interference with normal breathing, which is a violation of Prisoner Handling, Preliminary Order 8.1 and Use of Force Principles, General Order 1.30.

IMPD Internal Affairs Report, City 004992.[5]

When deposed, IMPD Assistant Chief Catherine Cummings answered in the affirmative when asked whether she, the IMPD Chief, and the Internal Affairs Division all determined "it was safe, feasible, and practical to move Mr. Whitfield into a recovery position from his prone position once he was cuffed behind his back, given that there were six officers on the scene, including four right next to him[.]"  Cummings Dep. at 68. Assistant Chief Cummings further testified that doing so would have been consistent with the training IMPD officers receive and consistent with the policies the officers were found to have violated.  *Id.*

## IV.    The Instant Litigation

---

[5] A criminal prosecution was also brought against Officers Sanchez and Ahmad connected with these events.

On June 22, 2022, Plaintiff filed its original complaint against Defendants, pursuant to 42 U.S.C. § 1983, alleging that Defendants' actions violated Mr. Whitfield's Fourth Amendment right to be free from unreasonable seizures. Plaintiff amended its complaint on November 11, 2022, and then a final time on November 26, 2024, alleging that the individual officers' actions constituted an unreasonable seizure of Mr. Whitfield by the use of excessive force, in violation of the Fourth Amendment, and battery and negligence under Indiana common law, and that the City is responsible for the officers' actions under *Monell v. Department of Social Services of City of New York*, 429 U.S. 1071 (1977), based on its failure to properly train the officers, and, under state law, is liable for its own actions and the actions of its officers under the doctrine of *respondeat superior*. Now before the Court are Defendants' motions for summary judgment, both of which are fully briefed and ripe for ruling.

## Legal Analysis

### I.    Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences

flowing from them in the light most favorable to the nonmovant.  *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

## II.    Fourth Amendment Excessive Force Claims Against Individual Officers

Plaintiff contends that Officer Sanchez used excessive force against Mr. Whitfield by tasing him twice despite the undisputed facts establishing that Mr. Whitfield was not verbally or physically threatening towards Officer Sanchez or others, and that all six individual officers used excessive force, or failed to intervene, when excessive force was used against Mr. Whitfield when officers placed him in the prone position, handcuffed him behind his back, kept pressure on him while he was lying prone and did not promptly move him to a recovery position, despite his verbal pleas that he could not breathe, all in violation of IMPD policy and their training.  Plaintiff's final contention is that, because the law was clearly established on these issues, an objectively reasonable police officer would have been on notice at the time that such actions were unconstitutional; thus, none of the officers is entitled to qualified immunity.  We address these claims in turn below.

### A.  Applicable Law

The Fourth Amendment guarantees citizens the right "to be secure in their persons … against unreasonable … seizures" of the person.  U.S. Const. Am. IV.  "A seizure for purposes of the Fourth Amendment is unreasonable if it is accomplished through the use of excessive force."  *Gonzalez v. City of Elgin*, 578 F.3d 526, 541 (7th Cir. 2009) (citation omitted).  Defendants seek summary judgment on Plaintiff's excessive force claims on the grounds that the force used to effectuate Mr. Whitfield's mental-health detention was objectively reasonable under the circumstances, and, even if the Court

22

were to find otherwise, that they are entitled to qualified immunity because their actions did not violate a clearly established constitutional right.

"A public official is entitled to qualified immunity from suit unless he violated a clearly established right." *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). In the context of Fourth Amendment excessive force claims, "the qualified-immunity doctrine gives 'enhanced deference to officers' on-scene judgments about the level of necessary force.'" *Dockery*, 911 F.3d at 466 (quoting *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 725 (7th Cir. 2013)). Although qualified immunity is an affirmative defense, "once a defendant claims qualified immunity, the burden is on the plaintiff to show that the right claimed to have been violated was clearly established." *Marshall v. Allen*, 984 F.2d 787, 797 (7th Cir. 1993).

Determining whether qualified immunity applies involves a two-step inquiry, "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013). "If *either* inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (quoting *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018)). The "order of inquiry is not rigid," and a court "may address the second question first if it simplifies the analysis." *Dockery*, 911 F.3d at 466 (citations omitted).

Whether the force employed by an officer in effecting a seizure is constitutionally excessive depends on its "objective reasonableness," which is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and is considered in light of the specific facts and circumstances of that particular case, allowing for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396, 397 (1989) (citations omitted). Because "[t]his constitutional inquiry is objective," it "does not take into account the motives or intent of the individual officers." *Phillips v. Community Ins. Corp.*, 678 F.3d 513, 520 (7th Cir. 2012) (citing *Graham*, 490 U.S. at 397).

In determining reasonableness, "[t]he Supreme Court has instructed [lower courts] to weigh the nature and extent of the force used against the severity of the suspect's crime, the nature and immediacy of the threat he posed to the officers or others, and the extent to which the suspect actively resisted or attempted to evade arrest." *Dockery*, 911 F.3d at 464 (citing *Graham*, 490 U.S. at 396). "The reasonableness standard is objective and fact intensive, asking whether each use of force was reasonable under the totality of the circumstances, including … the officer's awareness of the detainee's suspected mental illness." *Johnson v. Community Hosp. Anderson/Madison Cnty.*, No. 1:20-cv-00855, 2022 WL 900021, at *6 (S.D. Ind. Mar. 28, 2022) (citing *Turner v. City of Champaign*, 979 F.3d 563, 567–68 (7th Cir. 2020) (citation modified). These same standards apply to mental-health seizures. *See Turner*, 979 F.3d at 569.

24

To show that the right at issue was clearly established in the Fourth Amendment excessive force context, "the plaintiff must either (1) identify a closely analogous case that established a right to be free from the type of force the police officers used on him, or (2) show that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Cibulka v. City of Madison*, 992 F.3d 633, 639 (7th Cir. 2021) (internal quotation marks and citations omitted). "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (citation modified).

### B.  Taser Deployment

We turn first to address Plaintiff's claim that Officer Sanchez's use of a taser on Mr. Whitfield constituted excessive force in violation of the Fourth Amendment. To overcome Officer Sanchez's defense of qualified immunity on this claim, Plaintiff must establish that Officer Sanchez violated the Fourth Amendment by using a taser on Mr. Whitfield, and that, on April 25, 2022, it was clearly established that an officer using a taser against an individual in circumstances similar to those presented here violates the Fourth Amendment. Because we find for the reasons detailed below that, Officer Sanchez could have reasonably believed, in light of clearly established law and the information he possessed at the time, that his deployment of the taser was lawful, he is entitled to qualified immunity on this issue.

The Seventh Circuit recognizes "two guideposts in an excessive-force case" involving the use of a taser. *Dockery*, 911 F.3d at 467. "The first is that an officer's use of a Taser against an actively resisting subject either does not violate a clearly established right or is constitutionally reasonable." *Id.* Examples of active resistance include "kicking and flailing," "declining to follow instructions while acting in a belligerent manner," and "swatting an arresting officer's hands away while backpedaling." *Id.* (citations omitted). "The second guidepost is that an officer many not use significant force (like a Taser) against a 'nonresisting or passively resisting' subject." *Id.* (citation omitted). Examples of nonresistance or passive resistance include "a 'docile and cooperative suspect' who posed no threat and 'did not resist in any way'" and "a handcuffed, passive suspect." *Id.* (citations omitted).

Here, the facts of our case do not fall neatly at either of the two ends of this continuum. At the time Officer Sanchez first deployed his taser, he was neither alone nor outnumbered and up to that point, Mr. Whitfield had not verbally threatened anyone in the home or made anything other than incidental contact with any of the officers. However, Officer Sanchez had witnessed Mr. Whitfield to be in a demonstrably agitated state about which the officers had been told he was experiencing some sort of a mental episode or "psychosis" and that a prior physical altercation with his father had not subdued him. Officer Sanchez also observed Mr. Whitfield to be moving erratically throughout the house and failing over several minutes to comply with repeated directives from the officers and requests from his parents to get dressed so that he could be taken to the hospital. Just before Mr. Whitfield emerged from the kitchen into the dining room,

26

Officer Sanchez had heard a woman's scream come from the kitchen followed by a crashing noise and Officer Ahmad's shouted order to Mr. Whitfield to put down some unknown object.  Immediately before Officer Sanchez deployed his taser, Mr. Whitfield had exited the kitchen, turned around, and advanced quickly forward into the dining room only a few steps away from and toward Officer Sanchez, at which point Officer Sanchez activated his taser.

Plaintiff argues that a reasonable jury viewing this evidence as captured on the video could conclude that at the time he was first tased by Officer Sanchez, Mr. Whitfield was veering around the dining room table in an attempt to avoid the officers in the living room rather than charging directly at Officer Sanchez, as Defendants have described his actions.  Under this interpretation, Plaintiff contends that a reasonable jury could conclude that Mr. Whitfield was, at most, passively resisting the officers' efforts to detain him and thus that Officer Sanchez would have been on notice that his initial tasing of Mr. Whitfield constituted excessive force in violation of the Fourth Amendment, given that it was clearly established at the time that an officer could not use a taser on a passively resisting individual.  Plaintiff argues that this would have been entirely clear to a reasonable officer, given Mr. Whitfield's diminished mental state and potential inability in such a state to physically comply with the officers' directives.  *See Phillips*, 678 F.3d at 526 ("There is a commonsense need to mitigate force when apprehending a non-resisting suspect, particularly when the suspect is known to have diminished capacity.  An arrestee may be physically unable to comply with police commands").

Viewing the facts in the light most favorable to Plaintiff as is required on summary judgment, we agree that the video evidence here is susceptible to differing interpretations regarding whether Mr. Whitfield was intending to continue advancing toward Officer Sanchez or instead whether he would have proceeded around the dining room table in an effort to avoid the officers had he not been tased. However, the fact of two possible interpretations of the evidence is not the relevant issue here. Rather, it is whether Officer Sanchez could reasonably have perceived that Mr. Whitfield was rushing toward him at the time he first deployed his taser, and, if so, whether in light of clearly established law and the information he possessed at the time, Officer Sanchez could reasonably have believed that Mr. Whitfield's rushing toward him constituted active resistance to the officers' attempts to detain him that justified the significant force used.

Based on the information known to Officer Sanchez at the time, including the sounds of commotion that he had heard coming from the kitchen just before Mr. Whitfield emerged from that area, and the video evidence undisputedly showing Mr. Whitfield advancing quickly in Officer Sanchez's direction at the moment he first deployed the taser, Officer Sanchez could reasonably have perceived, as he apparently did, based on his testimony, that the danger of the situation was escalating. Seventh Circuit law is clear that in "tense, uncertain, and rapidly evolving" situations such as that facing Officer Sanchez at the time he deployed his taser, the Court must take into account the reality that officers are required to make a "split-second" judgment call as to the use of the appropriate level of force. Under these circumstances, Officer Sanchez could also have reasonably determined, particularly given Mr. Whitfield's size and excited state, that

Mr. Whitfield's sudden movement towards him constituted an immediate threat under the circumstances that put at risk Officer Sanchez's own safety and/or that of the officers and other occupants in the home.  Although IMPD's policies require an officer to warn an individual before tasing him, if feasible, a reasonable officer under the circumstances faced by Officer Sanchez could reasonably have believed that events were unfolding too quickly for a warning to have been feasible.[6]

The cases cited by Plaintiff, including *Abbott v. Sangamon County.*, 705 F.3d 706 (7th Cir. 2013) (holding that it was clearly established "that it is unlawful to deploy a taser in dart mode against a nonviolent misdemeanant who had just been tased in dart mode and made no movement when, after the first tasing, the officer instructed her to turn over"), *Phillips v. Community Insurance Corporation*, 678 F.3d 513 (7th Cir. 2012) (finding that it was clearly established that firing four shots from SL6 Baton Launcher at driver with diminished capacity who heard but refused to obey commands to exit her vehicle was unlawful), *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 859 (7th Cir. 2010) (first tased while moving away, not toward officers) and *Dockery v. Blackburn*, 911 F.3d 458 (7th Cir. 2018) (identifying "a 'docile and cooperative' suspect who posed no threat and 'did not resist arrest in any way'" and "a handcuffed, passive suspect" as examples of nonresistence or passive resistance) clearly establish the general rule that a police officer can use a taser against an actively resisting subject, but not against a nonresisting or passively resisting individual.  These cases are not, however, sufficiently analogous to the

---

[6] In any event, a violation of IMPD policy does not establish a violation of the Fourth Amendment.

circumstances at bar to clearly establish that Mr. Whitfield's rapid advancement towards Officer Sanchez constituted passive rather than active resistance to the officers' efforts to detain him, such that Officer Sanchez would have been on notice that his use of the taser under the circumstances presented was in violation of the Fourth Amendment. Nor can we say that Officer Sanchez's use of force under these circumstances was so excessive that any reasonable officer would know that it was unconstitutional. For these reasons, we hold that Officer Sanchez is entitled to qualified immunity as to his first deployment of the taser.

Officer Sanchez is also entitled to summary judgment on Plaintiff's claim that his second deployment of the taser constituted excessive force in violation of the Fourth Amendment. The video evidence shows that the second time that Officer Sanchez used his taser—this time against Mr. Whitfield's leg in drive stun mode—Mr. Whitfield had not yet been fully incapacitated or subdued. He was in a sitting position, had made a frantic movement with his right arm that pulled down the tablecloth from off the dining room table causing glassware on the table to fall to the floor around him as well as the officers as they attempted to handcuff him, and was thrashing his body such that it was reasonable for Officer Sanchez to have believed that Mr. Whitfield had "not yet submitted to the officers' authority after the first Taser shock" and thus was actively resisting. *Dockery*, 911 F.3d at 468. Under these circumstances, Officer Sanchez did not violate clearly established law by using the taser a single time in drive stun mode to subdue Mr. Whitfield to permit him to be handcuffed. *See, e.g.*, *Abbott*, 705 F.3d at 728 ("Insofar as [the individual] continued to resist after the first tasing, [the deputy] did not violate

30

clearly established law by using the Taser in drive stun mode several more times until [the individual] was subdued.").

For these reasons, Defendant Sanchez is entitled to summary judgment on Plaintiff's excessive force claim based on his two uses of a taser to subdue Mr. Whitfield.

### C. Handcuffing in Prone Position and Failure to Move to Recovery Position

We turn next to Plaintiff's claim that the officers' seizure of Mr. Whitfield by placing him and maintaining him in a prone position while handcuffed behind his back, even after he had stopped moving and responding rather than promptly moving him to the recovery position, constitutes excessive force in violation of the Fourth Amendment. Defendants rejoin that, given Mr. Whitfield's active resistance and lack of visible signs of medical distress, the officers' conduct was objectively reasonable, and, in any event, because there is no clearly established law that would have put the officers on notice that their conduct in failing to move Mr. Whitfield to the recovery position was unconstitutional, they claim that they are entitled to qualified immunity.

To the extent that Plaintiff argues that a reasonable jury could find that it was objectively unreasonable for the officers to place Mr. Whitfield in a prone position to handcuff him, we disagree. As discussed above, the assessment of objective reasonableness under Fourth Amendment standards "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and

whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

While Mr. Whitfield had committed no crime when he was restrained by the officers, there is no dispute that the officers had the lawful power to immediately detain him for mental health reasons, and "[w]ith the lawful power to detain [him] came the legal power to use reasonable force to accomplish the detention." *Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020). Even after being tased twice, Mr. Whitfield continued to thrash and flail in a manner that a reasonable officer could believe was active resistance to their efforts to handcuff him, which the undisputed evidence establishes was required before medics would enter the home to transport him to the hospital to receive mental health treatment. Under these circumstances, it was reasonable under Fourth Amendment standards to place Mr. Whitfield in a prone position for handcuffing. *See Turner*, 979 F.3d at 569 ("[T]he police may use significant force to subdue someone who is actively resisting lawful detention."); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 594 (7th Cir. 1997) (holding that it was objectively reasonable for officers to have brought an actively resisting individual experiencing a mental health crisis down to the ground to handcuff him).

However, what is an objectively reasonable level of force at one stage of an encounter may be objectively unreasonable at another and officers must modulate their use of force downward if the threat has dissipated and their previous level of force is no longer justified by the circumstances. *See Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("Even under [the defendant officer's] account, … a jury could conclude that the

immediate danger had passed by the time [the defendant officer] fired, in which case the force would have been excessive.").  Given the totality of circumstances that played out here, which we view in the light most favorable to Plaintiff as is required at summary judgment, a reasonable jury could find that the officers' conduct in continuing to keep Mr. Whitfield handcuffed behind his back in a nearly prone position, rather than move him to the recovery position once he was subdued, was objectively unreasonable and constituted excessive force in violation of the Fourth Amendment.

There can be no dispute that the officers knew that Mr. Whitfield, who was unarmed and had committed no crime, was suffering from some kind of mental health episode, was morbidly obese, sweating profusely, had been twice tased, and had been exerting himself physically at the time he was secured on his stomach on the floor in handcuffs behind his back.  These facts, viewed in the light most favorable to Plaintiff, could permit a reasonable jury to find that a reasonable officer would have been on notice that Mr. Whitfield was having trouble breathing after he was subdued.  Mr. Whitfield can be seen on the body camera footage thrashing about while in the prone position as he is handcuffed and can be heard repeatedly saying, "can't breathe," before he went limp and stopped moving or making any other noise.  The officers deny ever having heard Mr. Whitfield say that he could not breathe, but it is audible on the officers' body camera footage, from which we conclude that a reasonable jury could find that the officers could have heard Mr. Whitfield's cries.  Whether the officers in fact heard Mr. Whitfield is a credibility issue that must be resolved by the jury.

33

A reasonable jury could also find, as Plaintiff argues, that these conditions and the significant risk of serious bodily harm, even of death, that they presented to Mr. Whitfield were not hidden from the officers. The adduced evidence establishes that the officers' training and IMPD policies made clear that restraining *any* individual in the prone position with his hands behind his back can be dangerous, and keeping him in that position even more so, particularly if the individual is obese and displaying the above symptoms. IMPD officers are trained that "positional asphyxia" is "[a] condition in which the position of the body interferes with normal respiration and causes an extreme decrease in the amount of oxygen in the body accompanied by an increase of carbon dioxide which may lead to loss of consciousness and death." Dkt. 178-27. In recognition of these grave risks, IMPD policies and training make clear that "[o]fficers should avoid leaving any prisoner on their chest or stomach for any period of time longer than is absolutely necessary, regardless of the type of restraint used," and that "[t]he subject should be moved onto their side, allowing less interference with normal breathing, as soon as possible." *Id.*

The body camera footage also shows that, once Mr. Whitfield was handcuffed, he quickly went from thrashing and crying out to completely subdued, and, other than a few quiet cries and small movements shortly after he was handcuffed, he then stopped moving altogether and making any noise. A reasonable jury could find that, once Mr. Whitfield was restrained and subdued, it was objectively unreasonable for the officers to have continued to keep him positioned on his stomach for nearly four additional minutes, in light of the well-known risks associated with prolonged prone restraint, particularly for

someone with his additional vulnerabilities, including all the characteristics and symptoms noted above, including his cries that he could not breathe.

Indeed, once Mr. Whitfield was handcuffed and subdued, Officer Mathew, a rookie officer, specifically inquired of the other officers whether Mr. Whitfield should be moved off his stomach and into a recovery position on his side. A reasonable jury could find that Officer Ahmad's proffered reason for failing to do so, to wit, that he did not want Mr. Whitfield to get up and fight again, was not objectively reasonable given that, despite his prior erratic and volatile behavior, Mr. Whitfield was by that point in no way resisting detention and was handcuffed and restrained, surrounded by four officers, all of whom had their hands placed on him.[7] *See, e.g.*, *Hayes v. City of Indianapolis*, No. 1:08-cv-006-DFH-JMS, 2009 WL 700232, at *4 (S.D. Ind. Mar. 16, 2007) ("It has long been well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders.") (collecting cases).

Defendants view this case as indistinguishable from the facts presented in *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (1997), in which the Seventh Circuit held that the defendant officers did not use unreasonable force when they restrained an obese individual in a prone position during a mental health crisis because the medical

---

[7] Citing the testimony of its medical expert, Dr. Steinberg, Plaintiff argues that a reasonable jury could find that the officers were applying at least some amount of weight pressure on Mr. Whitfield throughout the period that he was handcuffed on his stomach, further demonstrating the objective unreasonableness of their conduct. Defendants have moved to exclude this testimony from Dr. Steinberg. Because we find, for the reasons detailed herein, that a reasonable jury could find that the officers' conduct in failing to move Mr. Whitfield to the recovery position constituted excessive force even without the disputed evidence, we need not and do not decide the admissibility of Dr. Steinberg's testimony on this subject at this time.

conditions that exacerbated the officers' use of force and resulted in the individual's death were not "observable to the untrained eye." *Id.* at 594. While we acknowledge that *Estate of Phillips* is factually similar in many ways, we consider it distinguishable in two dispositive ways.

First, in *Estate of Phillips*, unlike here, the detainee was actively resisting throughout the encounter with the officers. When the officers arrived, the detainee "had a ballpoint pen clenched in each hand" that he would not relinquish and which the officers believed, due to his size and the manner in which he held them, could have been used "to cause severe injury." 123 F.3d at 589, 592. As the officers attempted to restrain him, he "became extremely violent," thrashing, kicking, and attempting to bite the officers. Even after he was handcuffed, he continued to struggle and kick in such a way that leg restraints were required. The Court held that the officers' actions under these circumstances "amount[ed] to an objectively reasonable response to the escalating situation they faced." 123 F.3d at 593.

Here, in contrast, once Mr. Whitfield was handcuffed, rather than continue to violently resist, he quickly became subdued and submissive and then entirely nonresponsive, yet the officers kept him restrained on his stomach with his hands behind his back for nearly four minutes without checking to ensure that he was still breathing or calling his name to ensure he was responding. Under these facts, a reasonable jury could find that any potential threat facing the officers was not escalating, as had been the fact in *Estate of Phillips*, but instead, that the situation had deescalated such that continuing to keep Mr. Whitfield nearly prone on his stomach, handcuffed behind his back, when he

was not moving, constitutes an objectively unreasonable use of force. *See id.* at 593 ("Restraining a person in a prone position is not, in and of itself, excessive force *when the person restrained is resisting arrest.*") (emphasis added).

Second, and most critically, the incident in *Estate of Phillips* occurred in 1993, before there was any broad-based public and law enforcement awareness of the risks associated with prone restraint. There, the Court specifically relied upon the fact that "[n]one of the plaintiffs' materials supports that restraining an individual in a prone position carries with it a substantial risk of causing death or serious bodily harm." 123 F.3d at 594. Thus, the officers in *Estate of Phillips* were not on notice of this danger. On the other hand, the evidence before us shows that the officers were specifically trained that prone restraint carried such risks, particularly for individuals exhibiting specific symptoms, several of which Mr. Whitfield was exhibiting at the time the officers kept him restrained on his stomach, handcuffed with his hands behind his back. Additionally, in the case at bar, the autopsy report and Plaintiff's proffered expert testimony create a permissible, reasonable inference that the officers' failure to move Mr. Whitfield to the recovery position after he was subdued caused his death.[8]

Thus, while *Estate of Phillips* establishes that "placing a person in a prone position while handcuffed on the floor does not, in and of itself, violate the Fourth Amendment," *id.* at 593, Plaintiff has adduced sufficient evidence to support its theory that it was objectively unreasonable for the officers to continue to keep Mr. Whitfield nearly prone

---

[8] Defendants, of course, have adduced evidence otherwise, but we cannot choose between competing inferences on summary judgment.

on his stomach with his hands cuffed behind his back after any threat he posed had been neutralized.  Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find, based on Mr. Whitfield having cried out four times that he could not breathe, following which he stopped moving and went silent, police policies and training warning officers about the dangers of the prone position, including several exacerbating factors exhibited by Mr. Whitfield, and knowledge of his mental illness, that Mr. Whitfield's condition was not hidden to the officers, thus distinguishing the situation here from *Estate of Phillips*.

Defendants argue that, even assuming that the officers' actions could be found to violate the Fourth Amendment, they are entitled to qualified immunity because clearly established law at the time would not have put the officers on notice that their actions were constitutionally deficient.  In support of this argument, Defendants again cite *Estate of Phillips*, which we have just distinguished, and *Day v. Wooten*, 947 F.3d 453 (7th Cir. 2020), in which the Court held that no Seventh Circuit precedent clearly establishes "the right of an out-of-breath arrestee to not have his hands cuffed behind his back after he complains of difficulty breathing."  *Id.* at 463.

The conduct and circumstances in *Day* are significantly different from those at bar, however.  In *Day*, the arrestee was suspected of shoplifting while armed with a gun.  *Id.* at 456.  Once apprehended, he was placed in one set of handcuffs behind his back in a sitting position.  Rather than remain in a seated position as instructed, Day voluntarily rolled onto his stomach.  *Id.* at 456–57.  After two failed attempts to keep him seated upright, the officer positioned him on his side because the officer "believed this was the

best course of action to prevent Day from asphyxiating by rolling onto his stomach." Other officers arrived and they "repositioned Day several times when he rolled onto his stomach." *Id.* at 457. When Day complained that he was having trouble breathing, the officers called for paramedics who examined Day and performed multiple tests, concluding that Day was breathing regularly and normally and did not need to go to a hospital. *Id.* Officers added a second set of handcuffs to accommodate Day's size and requested a jail transport. When the driver arrived, he found Day unresponsive, lying on his back with his hands still cuffed behind his back. A second ambulance was called, and, although Day was at that point still breathing, sadly, he later died. *Id.* at 458. Based on these facts, the Court found that it was not clear under the circumstances that Day's trouble breathing was caused by handcuff positioning, and, because the handcuffs were used in a manner that would not have harmed an average arrestee and the officers were unaware the handcuffs were causing breathing trouble, their conduct was not obviously unlawful. *Id.* at 463–64.

Unlike the circumstances before us, in *Day*, the officers recognized the dangers associated with prone restraint and ensured that Day, who, like Mr. Whitfield, was "overweight, sweating, and breathing heavily," *id.* at 456, at the time he was handcuffed, remained in the exact position that Plaintiff contends the officers here should have placed Mr. Whitfield. Additionally, in *Day*, the officers were told by paramedics that Day was breathing normally such that they had no reason to believe his complaints of trouble breathing were related to handcuff placement. Due to these determinative factual

distinctions, we cannot find that *Day* would have put the officers responding to Mr. Whitfield on notice that their acts were permissible, as Defendants argue.

In fact, we conclude to the contrary. In *Day*, the Court identified two clearly established rights that are relevant to whether the officers here would have been on notice that their conduct could be found unlawful. First, the right "to be free from an officers' knowing use of handcuffs in a way that would inflict unnecessary pain or injury, if that person presents little or no risk of flight or threat of injury." 947 F.3d at 462 (quoting *Rooni v. Biser*, 742 F.3d 737, 742 (7th Cir. 2014)). Second, the right "to have a known injury or condition considered, together with other circumstances, by officers when handcuffing." 947 F.3d at 463 (citing *Stainback v. Dixon*, 569 F.3d 767 (7th Cir. 2009)). In *Stainback*, the Court acknowledged that "in some cases, the fact that an act will cause pain or injury will be clear from the nature of the act itself." 569 F.3d at 772.

This case law, coupled with the fact that it was clearly established well before these events that no more than minimal force was permissible to detain a non-resisting subject, *Becker v. Elfreich*, 821 F.3d 920, 928–29 (7th Cir. 2016), and that "force that is reasonable while a suspect poses a threat may no longer be reasonable as the threat decreases," *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (citing *Cyrus*, 623 F.3d at 863), was sufficient to put the officers on notice that keeping Mr. Whitfield on his stomach with his hands cuffed behind his back after he was subdued and under their control was unlawful, given the facts that a reasonable jury could find were known to them at the time, including their training and knowledge regarding the risks associated with prone restraint, Mr. Whitfield's obvious risk factors, and his cries that he could not

40

breathe followed by his becoming nonresponsive.  Accordingly, Defendants[9] are not entitled to qualified immunity and their motion for summary judgment on this claim is therefore denied.[10]

## III.    *Monell* Claim Against the City

Plaintiff argues in defense of the City's motion for summary judgement that sufficient evidence exists to allow a reasonable jury to determine that the City had failed to adequately train its police officers to respond to mental health crises and also failed to adequately respond to its officers' misconduct when the officers had failed to follow policies and training in dealing with such mental health crises.[11] Plaintiff contends that these failures establish the City's liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and its progeny for the officers' unconstitutional actions.

---

[9] Officer Clark did not participate in handcuffing Mr. Whitfield or keeping him prone on the floor.  Accordingly, a reasonable jury could not find that she engaged in an exercise of unreasonable force towards Mr. Whitfield.  Summary judgment shall enter in her favor.

[10] To the extent that Plaintiff seeks to parlay its excessive force claim based on the officers' actions in keeping Mr. Whitfield on his stomach with his hands cuffed behind his back rather than moving him on his side into a separate Fourth Amendment violation for inadequate medical care, we are not persuaded that such conduct constitutes "medical care" as such, believing it is more appropriately regarded as an aspect or component of the excessive force rubric.  Here, Officer Clark took the necessary steps upon her arrival on the scene to ensure that an ambulance was called and available to transport Mr. Whitfield to the hospital for mental health treatment once he was secured and she summoned the waiting EMTs into the residence as soon as Mr. Whitfield had been handcuffed.  Plaintiff's attempt to impose liability on the officers for their lapse in failing to notice sooner that Mr. Whitfield was not breathing, that claim has not been sufficiently developed and in any event did not entail "medical care."  Accordingly, Defendants are entitled to summary judgment on Plaintiff's Fourth Amendment claim based on their failure to provide medical care.

[11] To the extent Plaintiff originally asserted a second *Monell* claim regarding the City's alleged failure to provide sufficient counseling and mental health services for citizens needing assistance with mentally ill persons at night as opposed to the daytime hours, Plaintiff has waived any such claim by failing to offer in response to Defendants' motions for summary judgment on this claim any argument or authority in support.  *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 224 (7th Cir. 2015).

Under *Monell*, "a municipal entity is not vicariously liable for the constitutional torts of its employees" and instead "may be liable only for conduct that is properly attributable to the municipality itself." *Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 824 (7th Cir. 2022) (internal quotations and citations omitted). A constitutional deprivation may be attributable to a municipality only "when execution of a government's policy or custom inflicts the injury." *Houskins v. Sheahan*, 549 F.3d 480, 493 (7th Cir. 2008) (quotation marks and citation omitted). A plaintiff can show that a constitutional violation resulted from the execution of a municipal policy or custom in any of the following three ways: "(1) an express policy causing the loss when enforced; (2) a widespread practice constituting a 'custom or usage' causing the loss; or (3) a person with final policymaking authority causing the loss." *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) (citing *Chortek v. City of Milwaukee*, 356 F.3d 740, 748 (7th Cir. 2004)).

A "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). A failure to train constitutes an official custom or policy under *Monell* "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (citation and internal quotation marks omitted). "Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious

conduct by employees may establish the conscious disregard for the consequences of their actions—the deliberate indifference—necessary to trigger municipal liability." *Id.* (citation and internal quotation marks omitted). To succeed on a failure to train claim, a plaintiff must also "demonstrate a direct causal link between the municipal action [or inaction] and the deprivation of federal rights." *Bd. of Cnty. Com'rs of Bryan Cnty, Okl. v. Brown*, 520 U.S. 397, 404 (1997). "[I]t is not enough to show that a widespread practice or policy was a *factor* in the constitutional violation; it must have been the *moving force*." *Johnson v. Cook Cnty.*, 526 Fed. App'x 692, 696 (7th Cir. 2013) (citing *Estate of Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007)).

Here, Plaintiff seeks to impose liability against the City under the custom or practice prong of *Monell*. Plaintiff concedes that while "[o]n paper, the City's policies and training on dealing with the mentally ill and positional asphyxiation are adequate," a reasonable jury could find that the City was aware at the time of Mr. Whitfield's death that "[i]n practice, the City's officers woefully fail to adhere to those standards and training" yet did not take appropriate action to address these deficiencies or adequately discipline officers who violated its policies and training. Pl.'s Resp. at 57. In support of this contention, Plaintiff points to Defendants' failure in the case at bar to abide by their training regarding the dangers inherent in handcuffing mentally ill subjects behind their backs as they lay prone on the floor/ground and not repositioning them, as well as two similar recent failures of IMPD officers to follow these same policies and training resulting in the deaths of arrestees placed in prone restraint positions, namely, Paul Daniels on September 1, 2018 (*Estate of Paul Daniels v. City of Indianapolis*, 1:20-cv-

43

2280-JRS-MJD (case settled)), and Eleanor Northington on February 6, 2019 (*Estate of
Northington v. City of Indianapolis*, 1:21-cv-406-TWP-TAB (all federal claims dismissed
before trial)).  Plaintiff claims that the City's failure to adequately discipline its officers
when they fail to follow IMPD's policies and training are further evidence of the City's
deliberate indifference.

Where, as here, "a plaintiff claims that the municipality has not directly inflicted
an injury but nonetheless has caused an employee to do so, rigorous standards of
culpability and causation must be applied to ensure that the municipality is not held liable
solely for the actions of its employee."  *Bryan Cnty.*, 520 U.S. at 405 (citations omitted).
Plaintiff does not claim that the City's policies or training are inadequate or that the City
fails to follow its training program or require its officers to attend training, only that its
officers failed to adequately *retain* that information.  However, the City cannot be held
liable based simply on a mistake made by its officers that is contrary to their training as
"[t]ime and again the Supreme Court has reinforced the strict prohibition against allowing
principles of vicarious liability to establish municipal liability under §1983."  *J.K.J. v.
Polk Cnty.*, 960 F.3d 367, 377 (7th Cir. 2020).

Plaintiff characterizes its *Monell* claim as similar to that made by the plaintiffs in
*J.K.J v. Polk County*, but a comparison of those claims establishes that the facts are
readily distinguishable.  In *J.K.J.*, an inmate sued a correctional officer and his county
employer under the Eighth Amendment alleging that the officer repeatedly sexually
assaulted her and that the county's failure to adequately train its correctional officers
caused her constitutional injury.  Unlike here, in *J.K.J.*, the county had formulated only

44

minimal written policies setting forth the scope of the prohibition on sexual misconduct and the reporting procedures; "[a]side from these written policies, Polk County Jail staff received no training (in any sense of the word) focused on the sexual harassment or assault of female inmates." *Id.* at 374.  In upholding the jury's verdict, the Seventh Circuit cited evidence regarding the county's "dismissive attitude about preventing and detecting" sexual misconduct.  *Id.*

In contrast to *J.K.J.*, Plaintiff here concedes that the City's written policies covering the relevant standards and training are adequate.  In addition, the City has adduced unrebutted evidence establishing that it provides its officers extensive training on its policies, including 6 months of initial recruit training, which includes training on the use of force, dealing with mentally ill suspects, and de-escalation principles, followed by a 20-week Field Training Officer program, and an additional year as probationary officers.  Following their probationary year, all officers are required to receive annual in-service training.  Cummings Decl. ¶¶9–16; 21, 26, 36.  In response to Plaintiff's claim that the City fails to impose sufficient discipline on its officers when they violate IMPD policies, the evidence in the record before us establishes that three of the six individual defendants were in fact disciplined for actions related to Mr. Whitfield's apprehension and death.

Given the unrebutted evidence adduced by the City establishing the significant and ongoing training that IMPD officers must undergo to demonstrate their understanding and mastery through the probationary period as well as the required subsequent and ongoing training, no reasonable jury could infer that the City was deliberately indifferent to the

45

need for additional training and that its indifference was the "moving force" behind the constitutional violation at issue here. Accordingly, the City is entitled to summary judgment in its favor on Plaintiff's *Monell* claim.

## IV. State Law Claims

### A. Battery

Plaintiff has also brought a claim against Defendants for battery under Indiana common law. The parties agree that Plaintiff's battery claim is premised on the same facts and analysis as its federal excessive force claims. Accordingly, for the same reasons set forth above, Officer Sanchez is entitled to summary judgment on any battery claim based on his use of the taser against Mr. Whitfield and Officer Clark is entitled to summary judgment on any battery claim based on the officers' failure to move Mr. Whitfield to the recovery position but summary judgment is otherwise denied.

### B. Negligence

Finally, Defendants seek summary judgment on Plaintiff's negligence claim, as set forth in Plaintiff's Second Amended Complaint. Plaintiff, however, states that it is no longer advancing as the claim, which was previously "abandoned by Plaintiff in its statement of claims." Pl.'s Resp. at 60. Plaintiff thus concedes that Defendants' summary judgment motion "can … be granted" on this claim. *Id.* Accordingly, we grant summary judgment on Plaintiff's negligence claim.

## V. Conclusion

For the reasons detailed above, the Motion for Summary Judgment filed by Defendants Ahmad and Sanchez [Dkt. 165] is <u>GRANTED IN PART</u> and <u>DENIED IN</u>

PART.  It is <u>GRANTED</u> as to Plaintiff's Fourth Amendment excessive force and state law battery claims based on Officer Sanchez's use of the taser, Plaintiff's Fourth Amendment denial of adequate medical care claim and as to Plaintiff's negligence claim and <u>DENIED IN PART</u> as to Plaintiff's Fourth Amendment excessive force and state law battery claims based on the officers' failure to promptly move Mr. Whitfield to the recovery position.

The Motion for Summary Judgment filed by Defendants Virt, Clark, Bull, Mathew, and the City [Dkt. 169] is likewise <u>GRANTED IN PART AND DENIED IN PART</u>.  It is <u>GRANTED</u> as to Plaintiff's Fourth Amendment excessive force and battery claims based on the officers' failure to promptly move Mr. Whitfield to the recovery position against Officer Clark, as well as Plaintiff's Fourth Amendment lack of adequate medical care, *Monell*, and negligence claims and <u>DENIED</u> as to Plaintiff's Fourth Amendment and battery claims based on Defendants' failure to promptly move Mr. Whitfield to the recovery position against all but Officer Clark.

The case will proceed to trial accordingly.

IT IS SO ORDERED.


Date:  _____1/23/2026_____            _____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Israel Nunez Cruz
icruzlawfirm@gmail.com

Andrew R. Duncan
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS DUNCAN & MERCHANT,
LLP
ard@rkblegalgroup.com

Amy Stewart Johnson
Frost Brown Todd LLP
asjohnson@fbtlaw.com

John F. Kautzman
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS DUNCAN & MERCHANT,
LLP
jfk@rkblegalgroup.com

Stephanie V. McGowan
Frost Brown Todd LLP
smcgowan@fbtlaw.com

Anthony W. Overholt
Frost Brown Todd LLP
aoverholt@fbtlaw.com

Caren L. Pollack
POLLACK LAW FIRM, P.C.
cpollack@pollacklawpc.com

Phillip Mason Riley
Ruckelhaus, Kautzman, Blackwell, Bemis, Duncan & Merchant, L
pmr@rkblegalgroup.com

Richard A. Waples
WAPLES & HANGER
rwaples@wapleshanger.com

Caitlin Wilkinson
Office of Corporation Counsel
caitlin.wilkinson2@indy.gov